Paul R. SOGLIN, Henry W. Haslach, David L. Goldman, William T. Kaplan, Richard J. Scheidenhelm, Robert Swacker, James McFadden, Daniel Bernstein, Robert S. Cohen, William G. Simons, Students for a Democratic Society (Madison Chapter), individually and on behalf of those similarly situated, Plaintiffs,

v.

Joseph F. KAUFFMAN, individually and as Dean of Student Affairs at the University of Wisconsin (Madison Campus); Ralph Hanson, individually and as Chief of the University of Wisconsin (Madison Campus) Department of Protection and Security, and as a representative of a class known as police officers of the University of Wisconsin; the Regents of the University of Wisconsin; Wilbur Emery, individually and as Chief of Police of the City of Madison, Wisconsin, and as a representative of a class known as police officers of the City of Madison; James Boll, individually and as District Attorney of Dane County, Wisconsin; Bronson C. La Follette, individually and as Attorney General of the State of Wisconsin; their Agents, Assistants, Successors, Employees, Attorneys and all those acting in concert with them or at their direction, Defendants.

No. 67–C–141.

United States District Court
W. D. Wisconsin.

Dec. 13, 1968.

See also, D.C., 286 F.Supp. 851.

Percy L. Julian, Jr., Michael A. Reiter, Madison, Wis., William M. Kunstler, Arthur Kinoy, New York City, Dennis Roberts, Harriet Van Tassel, Morton Stavis, Newark, N. J., for plaintiffs.

Bronson C. La Follette, Atty. Gen. of Wis., Arlen C. Christenson, Deputy Atty. Gen., Thomas A. Lockyear, Asst. Atty. Gen., Madison, Wis., for defendants, Kauffman, Hanson, and Board of Regents.

John P. Koberstein, Madison, Wis., for defendant, Boll.

William A. Jansen, Asst. City Atty., Madison, Wis., for defendant, Emery.

JAMES E. DOYLE, District Judge.

This opinion deals with that branch of this action in which plaintiffs seek declaratory and injunctive relief with respect to Chapter 11.02 of the Laws and Regulations of the University of Wisconsin, and with respect to disciplinary proceedings based upon alleged "misconduct" rather than upon alleged violations of any express regulation or statute.

Plaintiffs are alleged to be ten students at the Madison campus of the University of Wisconsin, and an unincorporated association known as Students for a Democratic Society (Madison chapter). They undertake to sue on behalf of others similarly situated, as well as for themselves. Several of the defendants are alleged to be officials of the University of Wisconsin, having duties with respect to discipline.

The complaint alleges that on October 18, 1967, plaintiffs and members of their classes engaged in a demonstration on the Madison campus. The ensuing events, pertinent to this opinion, as alleged in the complaint were as follows:

By letter dated October 19, 1967, certain of the plaintiffs were advised by the defendant Dean Kauffman that their conduct on October 18 had violated Chapter 11.02 of the Laws and Regulations of the University, which was quoted in full; that they were being charged with disrupting the operations of the University; and that they were suspended from the University pending a hearing before the Administrative Division of the Committee on Student Conduct and Appeals.

By letter dated October 21, 1967, certain of the plaintiffs were advised by the chairman of the said Administrative Division that they were authorized to attend classes and write examinations pending the disciplinary proceedings; and that

"* * * it is charged that by committing the following acts you have disrupted the operation of the University in violation of Chapter 11.02:

"failing to leave the Commerce Building after being ordered to do so by University of Wisconsin Police Chief Ralph Hanson, who had previously declared an unlawful assembly. Your action thereby disrupted the operations of the Commerce School."

On or about November 1, 1967, certain of the plaintiffs, and others, received a copy of a document described as "Amended Charges" and signed by the chairman of the Administrative Division. The amended charges were that the named students:

"I. Intentionally, denied to others their right to interview for jobs with the Dow Chemical Corporation and to carry out that purpose did:

"a. Intentionally, physically obstruct and block the hall and doorways of the first floor of the Commerce Building;

"b. Intentionally deny to persons who desired to interview with Dow Chemical Corporation their right to do so;

"c. Intentionally deny to others their right of ingress and egress through the hallway;

"d. Intentionally deny to other University students and other members of the University community their right to attend and conduct classes;

"e. Intentionally deny to other University students and other members of the University community their right to carry on University operations in offices of the Commerce Building.

"II. Intentionally incited and counselled others to deny to others their right to interview for jobs with the Dow Chemical Corporation and to carry out that purpose did intentionally incite and counsel others to:

"a. Physically obstruct and block the hall and doorways of the first floor of the Commerce Building;

"b. Intentionally deny persons who desired to interview with Dow Chemical Corporation their right to do so;

"c. Intentionally deny to others their right of ingress and egress through the hallway;

"d. Intentionally deny to other University students and other members of the University community their right to attend and conduct classes;

"e. Intentionally deny to other University students and other members of the University community their right to carry on University operations in Administrative offices of the Commerce Building.

"III. Intentionally refused repeated requests to move and to unblock the hall and doorways of the first floor of the Commerce Building for the purpose of denying to others their right to interview for jobs with the Dow Chemical Corporation with the result that:

"a. Other University students were denied their right to interview with Dow Chemical Corporation;

"b. Other University students and members of the University community were denied their right to ingress and egress through the hallway;

"c. Other University students and members of the University commu-

nity were denied their right to attend and conduct classes;

"d. Other University students and members of the University community were denied their right to carry on University operations in the offices of the Commerce Building.

"All of the foregoing constituting:

"1. Misconduct, as well as

"2. A violation of Chapter 11.02, and 11.15 of the *University Policies on Use of Facilities and Outside Speakers.*" [1]

The complaint alleges that the defendants, or some of them, have in fact expelled two of the plaintiffs and "another member of plaintiffs' classes * * * by application of the doctrine of 'misconduct', and are threatening suspension, expulsion or other denial of matriculation * * * to other members of plaintiffs' classes for alleged violation of the doctrine of 'misconduct' and by reason of the application of the doctrine of 'misconduct' ".[2]

So far as the present action is concerned, then, the defendants assert authority to discipline students: (1) for "misconduct"; and (2) for violations of

[1.] Chapter 11.15 of the Laws and Regulations of the University of Wisconsin provides:

"Those who attend a speech or program sponsored by student organizations, University departments, or other authorized groups, have the duty not to obstruct it, and the University has the obligation to protect the right to listen or participate."

Counsel for the defendants have stipulated in this action that Chapter 11.15 is inapplicable to the circumstances of *this case and that it is not relied upon* as support for disciplinary action with respect to the events of October 18.

Also, on or about November 1, 1967, in the course of proceedings in this court, defendants filed a brief in which it was stated that "the plaintiffs have been charged with misconduct under Section 36.12, Wisconsin Statutes"; in oral argument counsel for the defendants asserted the disciplinary proceed-

ings were grounded in part upon an alleged violation of Sec. 36.12, Wis.Stats. Sec. 36.12 provides, in part:

" * * * the regents shall have the power * * * to confer upon the faculty by by-laws the power to suspend or expel students for misconduct or other cause prescribed in such by-laws."

Counsel for the defendants have since stipulated that Sec. 36.12 is enabling legislation, that the section itself expresses no command or prohibition capable of being violated, and that no alleged violation of its terms is relied upon as support for disciplinary action with respect to the events of October 18.

[2.] From a pleading other than the complaint (a motion for a temporary restraining order, and an affidavit in support of the motion), it appears that the expulsions were based on alleged misconduct which occurred several weeks subsequent to October 18, 1967.

Chapter 11.02 of the Laws and Regulations of the University, which provides:

"*Scope of Student Freedom.* Students have the right, accorded to all persons by the Constitution, to freedom of speech, peaceable assembly, petition and association. Students and student organizations may examine and discuss all questions of interest to them, and express opinions publicly as well as privately. They may support causes by lawful means which do not disrupt the operations of the University, or organizations accorded the use of University facilities." [3]

Plaintiffs contend that the term "misconduct", as a standard for disciplinary action by the University, violates the First and Fourteenth Amendments to the Constitution of the United States because of its vagueness and overbreadth. Plaintiffs also contend that Chapter 11.02 as written violates the First and Fourteenth Amendments because of its vagueness and overbreadth. Pursuant to pretrial order, defendants have filed a partial answer to these two contentions, each of which has been denied. With respect to these two contentions, the relief sought is a declaratory judgment and injunctive relief consistent with the declaration. This opinion and the order entered pursuant to it

reach only these two contentions and the relief sought with respect to them. [4]

*Jurisdiction*

 Jurisdiction of the action with respect to the term "misconduct" as a standard for discipline and with respect to Chapter 11.02, is claimed pursuant to 42 U.S.C. § 1983, and 28 U.S.C. §§ 1343 (3) and 1343(4), among other statutes. Jurisdiction is present. The complaint sufficiently alleges that the defendants, or some of them, under color of a regulation or custom or usage of the State of Wisconsin, have subjected and threaten to subject the plaintiffs to the deprivation of rights and privileges secured to them by the Constitution of the United States. Defendants have contended that the court lacks jurisdiction over the subject matter because plaintiffs have failed to exhaust the administrative remedies made available to them by the state. Such exhaustion is not required as a condition to the exercise of jurisdiction in this action under 42 U.S.C. § 1983. Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967).

*"Misconduct" as a Standard*

The amended charges of November 1, 1967, set forth in full above, allege rather specific behavior on the part of the

3. In response to an application by plaintiffs at the commencement of this action, I restrained the defendants from imposing any sanction by reason of alleged violations of Chapter 11.02 based on the events of October 18, and from conducting hearings or other similar steps in proceedings theretofore commenced for violations of Chapter 11.02. I declined to restrain the defendants from conducting disciplinary proceedings or from imposing sanctions based upon the term "misconduct" as a standard for discipline, as distinguished from Chapter 11.02. Defendants continue to assert their authority to discipline students for violations of Chapter 11.02.

4. The complaint contains many factual allegations to the effect that, assuming that neither Chapter 11.02 nor the term "misconduct" as a standard for disci-

plinary action is fatally vague or overly broad, each nevertheless has been applied, and the application of each is threatened, "for the purpose of discouraging protected activities". Dombrowski v. Pfister, 380 U.S. 479, 490, 85 S.Ct. 1116, 1122, 14 L.Ed.2d 22 (1965). Defendants have filed a number of motions for various forms of relief, including severance of the claims of the complaint as against the various defendants, a determination with respect to the propriety of the classes on whose behalf the action is brought, and a requirement of a more definite statement. In this opinion and in the order to be entered pursuant to it, the court reaches none of the issues raised by the said factual allegations of the complaint nor by the defendants' motions referred to in this footnote.

named students and conclude with the following:

"All of the foregoing constituting:

"1. Misconduct, as well as

"2. A violation of Chapter 11.02. * * * "

If the term "misconduct", without more, may serve as a standard for disciplinary action, it is not essential to the defendants' position that Chapter 11.02 be vindicated as a prohibitory regulation. For reasons which will be explained herein, I turn initially to the broader contention of the defendants: that the term "misconduct" may serve as a standard for disciplinary action, and that no more specific or definite substantive rules are required as a prerequisite for disciplinary action.

■■ With respect to the imposition of criminal sanctions in the non-university society [5], such a regime would grossly violate the Constitution of the United States.

"[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322.

A federal, state, or local statute, ordinance, regulation, order or rule, subjecting one to imprisonment or fine or other serious sanction for "misconduct" would surely fall as unconstitutionally vague. Moreover, it would not be necessary that a challenger await the outcome of an attempted application of so vague a rule to him in a specific judicial or administrative proceeding, and then dispute the validity of the rule only as applied. He could challenge the prospective application of a vague rule and obtain a judicial declaration of its invalid-

ity and injunctive relief against attempts to enforce it. Champlin Refining Co. v. Corporation Commission of Oklahoma, 286 U.S. 210, 219, 52 S.Ct. 559, 76 L.Ed. 1062 (1932); Cline v. Frink Dairy Co., 274 U.S. 445, 47 S.Ct. 681, 71 L.Ed. 1146 (1927); and Connally v. General Construction Co., supra.

■ Defendants here contend that, given the opportunity, they can prove that with respect to the events of October 18, those students who were subsequently subjected to disciplinary action had received prior warnings from certain university administrators that they would be punished if they performed the acts which they are alleged to have proceeded nevertheless to perform. It is not contended that defendants could prove that those administrators who issued the warnings were themselves (as distinguished, for example, from the board of regents or the faculty, Sec. 36.12, Wis.Stat.) empowered to promulgate generally applicable rules of conduct for university students. Nor could it be contended that the term "misconduct" itself prescribes intelligible standards or criteria by which these administrators might exercise discretion to issue a specific warning or order in a specific case. In the non-university society, in the absence of a reasonably clear rule or standard or criterion promulgated by those duly empowered to promulgate them, one may not be punished for violating the order of an administrator, such as a policeman. Wright v. Georgia, 373 U.S. 284, 291–292, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963). See Shuttlesworth v. City of Birmingham, 382 U.S. 87, 90–91, 86 S. Ct. 211, 15 L.Ed.2d 176 (1965); Cox v. Louisiana, 379 U.S. 536, 579, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (separate opinion of Mr. Justice Black); Kunz v. New York, 340 U.S. 290, 293–295, 71 S.Ct. 312, 95 L.Ed. 280 (1951); Schnei-

---

5. "Non-university society", as used herein, is a shorthand expression not intended to be wholly precise. Colleges, secondary schools, primary schools, the military, or penal institutions, for ex-

ample, may or may not be comparable to universities for certain constitutional purposes. Some implications of these comparisons will be referred to hereinafter.

der v. State of New Jersey, etc., 308 U.S. 147, 164, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

Moreover, the vagueness doctrine is not to be conceived as being limited solely to the concept of fair notice as an element of substantive due process. The vagueness doctrine embodies a First Amendment concept as well:

"The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." NAACP v. Button, 371 U.S. 415, 432–433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963).

"Vague laws in any area suffer a constitutional infirmity. When First Amendment rights are involved, we look even more closely lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech or of the press suffer." Ashton v. Kentucky, 384 U.S. 195, 200, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966).

Whether a given rule "involves" First Amendment rights so as to require that it be looked to "more closely" is often relatively easy to determine: a rule against bank robbery does not; a rule regulating public gatherings probably does. A rule against "misconduct" is so grossly vague that possible involvement of First Amendment rights cannot be ignored. It is not permissible to "presume that the statute curtails constitutionally protected activity as little as possible." NAACP v. Button, supra, 371 U.S. at 432, 83 S.Ct. at 337.

For this reason, even if we were to assume, difficult as it is to do so, that in non-university society a rule simply prohibiting "misconduct" might survive the test of vagueness, it would be doomed as overly broad. " * * * [W]hen the end can be more narrowly achieved", Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, a rule which " * * * sweeps within its broad scope activities that are constitutionally protected free speech and assembly", Cox v. Louisiana, supra 379 U.S. at 552, 85 S.Ct. at 463, violates the First Amendment by reason of its overbreadth. Keyishian v. Board of Regents, etc., 385 U.S. 589, 609, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966); Cox v. Louisiana, supra; Aptheker v. Secretary of State, 378 U.S. 500, 514, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964). When one is subjected to prosecution based upon such an overly broad regulation, he is not limited to a defensive posture in resisting it. He may take the initiative in seeking declaratory and injunctive relief. Dombrowski v. Pfister, 380 U.S. 479, 486–487, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). Moreover, in such a situation the challenger enjoys an "exception to the usual rules governing standing. * * *" 380 U.S. at 486, 85 S.Ct. at 1121

" * * * [T]he instant decree may be invalid if it prohibits privileged exercises of First Amendment rights whether or not the record discloses that the petitioner has engaged in privileged conduct. For in appraising a statute's inhibitory effect upon such rights, this Court has not hesitated to take into account possible applications of the statute in other factual contexts besides that at bar. Thornhill v. Alabama, 310 U.S. 88, 97–98 [60 S.Ct. 736, 741–742, 84 L.Ed. 1093]; Winters v. New York, [333 U.S. 507], at 518–520 [68 S.Ct. 665, at 671–672, 92 L.Ed. 840]; Cf. Staub v. City of Baxley, 355 U.S. 313 [78 S.Ct. 277, 2 L.Ed.2d 302]." NAACP v. Button, supra, 371 U.S. at 432, 83 S.Ct. at 337. See Dombrowski v. Pfister, 380 U.S. at 486–487, 85 S.Ct. 1116; Aptheker v. Secretary of State, 378 U.S. 500, 516–517, 84 S.Ct. 1659 (1964).

"Possible applications of [a rule simply prohibiting 'misconduct'] in other factual contexts beyond that at bar" are limitless. With so grossly broad a stand-

ard as "misconduct", one need not strain to hypothesize applications which would be realistically predictable as well as "possible", and which would demonstrate that the standard "sweeps within its broad scope activities that are constitutionally protected free speech and assembly", Cox v. Louisiana, supra, 379 U.S. at 552, 85 S.Ct. at 463.

Defendants do not appear to dispute that with respect to the criminal law in non-university society the doctrines of vagueness and overbreadth, and the availability of these doctrines in prospective attacks upon criminal regulations, are substantially as stated above. Rather, it appears that their contention may be summarized as follows:

> Whether the power is conceived to be inherent or statutory (Sec. 36.12, Wis.Stats.), those charged with the governance of the university are empowered to discipline students for misconduct. (This proposition is conceded by the plaintiffs; conceded or not, I conclude that it is correct.)

> In exercising this power to discipline for misconduct, the university is not bound to promulgate any rules defining misconduct. The function of fair notice can be effectuated by means other than the promulgation of rules of general application. For example, university administrators can inform particular students in advance of a particular occasion that if the students behave in a particular manner, they will be punished. Notice of this latter type is constitutionally sufficient with respect to university disciplinary matters, although the vagueness doctrine might render it invalid in certain non-university situations.

> With respect to First Amendment guarantees as implemented both by

the vagueness and overbreadth tests, it is sufficient that disciplinary action be reasonably related to the maintenance of that order and decorum necessary to performance of the university's function. This determination is to be made by the courts by balancing the governmental interest in the university's program against the individual student's interest in his freedom. This "balancing" test is sharply to be distinguished from the tests of vagueness and overbreadth ("facial invalidity"). Moreover, the balancing test is not to be judicially applied prospectively, but case by case, after the disciplinary proceeding has been completed.

The reason for sparing disciplinary proceedings from the tests of vagueness and overbreadth, and particularly from prospective application of these tests, lies in the uniqueness of the university as an institution and in the university's historically demonstrated attachment to freedom.

Historically, universities and colleges and schools, both public and private, have enjoyed wide latitude in student discipline. Various "models" of the relationship between the university and its students have been employed by the courts for the purpose of determining the legal attributes of the relationship: parent-child (*in loco parentis*); owner-tenant; parties to a contract.[6] Van Alstyne, "The Student as University Resident", 45 Denver L.J. 582–598 (1968). Whatever the model or combination of models employed, the dominant pattern has been judicial non-intervention in the discipline of students by faculty, administrators, school boards, trustees, or regents.[7]

In recent years, however, courts have been increasingly disposed to intervene

---

6. The trustee-beneficiary model has been suggested. Goldman, "The University and the Liberty of its Students—A Fiduciary Theory", 54 Ky.L.J. 643 (1966).

7. The court decisions to this effect are so numerous that citation is pointless. No

controlling decision to this effect by the Court of Appeals for the Seventh Circuit, however, has been brought to my attention. With respect to decisions of the Supreme Court of the United States, see particularly the discussion herein-

in school disciplinary situations involving major sanctions. This has been most marked when intervention has appeared necessary to assure that procedural due process is observed: for example, specification of charges, notice of hearing, and hearing. Woods v. Wright, 334 F.2d 369 (5th Cir. 1964); Dixon v. Alabama State Bd. of Educ., 294 F.2d 150 (5th Cir. 1961), cert. den., 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961); Moore v. Student Affairs Comm. of Troy State Univ., 284 F.Supp. 725 (M.D.Ala.1968); Schiff v. Hanna, 282 F.Supp. 381 (W.D.Mich.1966) (en banc); Esteban v. Central Mo. State College, 277 F.Supp. 649 (W.D.Mo. 1967); Knight v. State Bd. of Educ., 200 F.Supp. 174 (M.D.Tenn.1961). But judicial intervention in school disciplinary cases in more recent years has not been confined to matters of procedural due process. The validity of substantive school rules has been the subject of judicial scrutiny. Burnside v. Byars, 363 F.2d 744 (C.A.5th, 1966) (high school regulation prohibiting students from wearing "freedom buttons" held invalid); Hammond v. South Carolina State College, 272 F.Supp. 947 (D.S.C., 1967) (rule prohibiting "parades, celebrations, and demonstrations" without prior approval of college authorities, held invalid); Dickey v. Alabama State Board of Education, 273 F.Supp. 613 (M.D. Ala., N.D.1967) (rule that no editorial in school paper could criticize governor or legislature, held invalid). See Buttny v. Smiley, 281 F.Supp. 280 (D.Colo., 1968) (upholding a regent rule against a vagueness contention).

Of course, the substantive guarantee of equal protection has been consistently applied to educational institutions, and specifically to regulations and practices adopted by boards of education and university administrators. Brown v. Board of Education, etc., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180 (1954) (Topeka Board of Educa-

tion); Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958) (Little Rock School Board); Holmes v. Danner, 191 F.Supp. 394 (M.D.Ga., 1961), stay denied, 364 U.S. 939, 81 S.Ct. 686 (1961) (university administrators). Also, loyalty oaths sought to be imposed upon teachers and other university personnel have been invalidated as vague or overly broad. Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Cramp v. Board of Public Instruction, etc., 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961).

Indeed, in numerous contexts, the Supreme Court has assigned a special importance to First Amendment guarantees in the educational setting.

"Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. Our courts, however, have not failed to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry and of belief. By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values. [Footnote omitted.] On the other hand, 'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools,' Shelton v. Tucker, 364 U.S. 479, 487 [81 S.Ct. 247, 251, 5 L.Ed.2d 231] (1960)." Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228, Nov. 12, 1968.

Underlying these developments in the relationship of academic institutions to the courts has been a profound shift in the nature of American schools and colleges and universities, and in the rela-

after of West Virginia State Board of Education v. Barnette, 319 U.S. 624,

63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674 (1943).

tionships between younger and older people. These changes seldom have been articulated in judicial decisions but they are increasingly reflected there. The facts of life have long since undermined the concepts, such as *in loco parentis*, which have been invoked historically for conferring upon university authorities virtually limitless disciplinary discretion.

■ I take notice that as of October, 1967, some 33,000 students were enrolled on the Madison campus; that many graduate schools, such as those of law and medicine, are situated on the Madison campus; that among the colleges, schools, or departments of the university at Madison are those of agriculture, business, engineering, family resources and consumer sciences, industrial relations research, journalism, military science, naval science, pharmacy, and a school for workers; that sources of major portions of its funds, in addition to state tax revenues, are grants from federal agencies and departments such as the Department of Health, Education and Welfare, and the Department of Defense; that the university has close and useful and productive ties to industry, agriculture, and organized labor in Wisconsin and elsewhere; that the university owns or controls a large area of land; that it owns or controls many buildings, some large, which are used as residences, classrooms, laboratories, offices, meeting places, restaurants, gymnasiums and playing fields (intramural and intercollegiate), and research centers; and that it maintains its own police force, hospital, parking lots, and similar functions and facilities.

■ I take notice that for some years the mean age of American college and university students has been more than 21 years, and that among them are more over 30 years than under 18.[8]

■ I take notice that particularly in recent years the universities have become theaters for stormy and often violent protest over such matters as war and peace, racial discrimination in our cities and elsewhere, and the quality of American life; that this phenomenon adds new and unanticipated dimensions to the regulation of conduct in the universities; and that those charged with governance of these institutions have been struggling to preserve the many competing values involved.

I take notice that in the present day, expulsion from an institution of higher learning, or suspension for a period of time substantial enough to prevent one from obtaining academic credit for a particular term, may well be, and often is in fact, a more severe sanction than a monetary fine or a relatively brief confinement imposed by a court in a criminal proceeding.

The world is much with the modern state university. Some find this regrettable, mourning the passing of what is said to have been the old order. I do not share this view. But whether the developments are pleasing is irrelevant to the present issue. What is relevant is that the University of Wisconsin at Madison may continue to encompass functions and situations such as those which characterized a small liberal arts college of the early 20th century (of which some no doubt exist today), but that it encompasses many more functions and situations which bear little or no resemblance to the "models" which appear to have underlain, and continue in some .cases to underlie, judicial response to cases involving college or university discipline. What is relevant is that in today's world university disciplinary proceedings are likely to involve many forms of misconduct other than fraternity hazing or plagiarism, and that the sanctions imposed may involve consequences for a particular student more grave than those involved in some criminal court proceedings.

■ The question here concerns the relationship, in today's world, be-

8. U. S. Bureau of the Census, Department of Commerce, Current Population Reports, Series P-20, No. 110, Population Characteristics 12 (1961).

tween the university board, faculty, and administrators as the governors, and students as the governed. Although there is considerable ferment in the universities about this very relationship, I see no constitutional bar to an arrangement by which the state vests in a board of regents and the faculty the power to govern a university and to discipline its students; nor do I see any constitutional bar to a prompt and severe disciplinary response to violence and rioting and other constitutionally unprotected conduct. The more precise question concerns the manner in which this power to govern and to discipline is exercised. It concerns whether the manner of its exercise is wholly immune to the application of the standards of vagueness and overbreadth. Even more precisely, it concerns whether the courts may—and if they may, whether they should—measure the sufficiency of university rules and regulations against these constitutional standards.

In West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674 (1943), the Court met head-on the question whether the courts may and should intervene when the First Amendment freedoms of students in public elementary and secondary schools are threatened by a regulation promulgated by a state board of education. The regulation in question required the students to salute the flag by raising their arms in a certain manner and by reciting the pledge of allegiance. Failure to comply was subject to expulsion, and expulsion involved related legal consequences. The Court held that the administrative regulation violated the First Amendment, as embodied in the Fourteenth; it took pains to make clear that the issue was not religious, and that persons whose scruples were other than religious were equally entitled to protection from such a regulation (319 U.S., at 634–635, 63 S.Ct. 1178). It rejected the contention that it should refrain from interference with the school board's functions, observing that school boards have "im-portant, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights" (319 U.S., at 637, 63 S.Ct. at 1185). It rejected the contention that it should refrain from entering a field "where courts possess no marked and certainly no controlling competence", Minersville School District v. Gobitis, 310 U.S. 586, 597–598, 60 S.Ct. 1010, 1014, 84 L.Ed. 1375, 127 A.L.R. 1493 (1940); it commented that its duty to apply the bill of rights to assertions of official authority depends not upon the Court's possession of marked competence in the field where the invasion of rights occurs, "but by force of our commissions":

> "We cannot, because of modest estimates of our competence in such specialties as public education, withhold the judgment that history authenticates as the function of this Court when liberty is infringed." 319 U.S., at 638–640, 63 S.Ct., at 1186.

The judgment of the district court enjoining enforcement of the school board regulation was affirmed.

In *Barnette*, 319 U.S., at 632, 63 S.Ct., at 1182, the Court described the holding in Hamilton v. Regents of University of California, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343 (1934), as follows: " * * that where a State, without compelling attendance, extends college facilities to pupils who voluntarily enroll, it may prescribe military training as part of the course without offense to the Constitution. It was held that those who take advantage of its opportunities may not on ground of conscience refuse compliance with such conditions." The Court distinguished *Hamilton* on two grounds: (1) in public primary and secondary schools in West Virginia, in which *Barnette* arose, attendance was not optional; and (2) " * * * independently of college privileges or requirements, the State has power to raise militia and impose the duties of service therein upon its citizens."

The present vitality of *Hamilton* has been sharply questioned, School

District of Abington Township, Pa. v. Schempp, 374 U.S. 203, at 251–253, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring); the current force of its distinction between state universities at which attendance is optional, and public elementary and secondary schools at which attendance is compulsory, is difficult to evaluate. It has not been expressly overruled. See Zanders v. Louisiana State Board of Education, 281 F. Supp. 747, 754, n. 14 (W.D.La.1968). It seems unnecessary here to invade the thicket of conceptual difficulties involved in the "rights-privileges" distinction and in the doctrine of unconstitutional conditions. See Van Alstyne, "The Demise of the Right-Privilege Distinction in Constitutional Law", 81 Harv.L.Rev. 1439, 1442–1449 (1968). It should be sufficient to observe that many courts have now concluded that whether the opportunity to attend a state institution of higher learning is viewed as a right or as a privilege, it may not be conditioned on the student's acceptance of a regime in which procedural due process is abdicated (see decisions cited at page 987, above) or in which substantive rules flatly restricting free expression are enforced (see decisions cited at page 987, above). Thus, it cannot presently be contended that in order to enjoy the "privilege" of higher education, one may be obliged to consent that he may be expelled without specification of charges, notice, or hearing, or to consent to remain silent on the political and social issues of his time. "A state cannot force a college student to forfeit his constitutionally protected right of freedom of expression as a condition to his attending a state-supported institution." Dickey v. Alabama State Board of Education, 273 F.Supp. 613, 618 (M.D.Ala., N.D. 1967).

 Finally, then, the issue is reached whether admission to the University of Wisconsin as a student, and continued enrollment there, may be made to depend upon consent to a regime in which due process may be denied by vague prohibitory standards, or freedom of expression may be threatened or denied by vague or overly broad prohibitory standards. For the reasons I have discussed the answer must be no, unless there is some compelling reason why the university should escape this particular constitutional stricture, some reason why it should be wholly free to refrain from promulgating reasonably definite and narrow rules of conduct. In Esteban v. Central Missouri State College, 290 F. Supp. 622, 630 (W.D.Mo., W.D., 1968), it was said:

"Judicial notice is taken that outstanding educational authorities in the field of higher education believe, on the basis of experience, that detailed codes of prohibited student conduct are provocative and should not be employed in higher education. See, Brady and Snoxell, Student Personnel Work in Higher Education, p. 378 (Houghton-Mifflin, Boston, 1961). For this reason, general affirmative statements of what is expected of a student may be preferable in higher education. Such affirmative statements should, of course, be reasonably construed and applied in individual cases."

I cannot agree that university students should be deprived of these significant constitutional protections on so slender a showing. The American Association of University Professors has declared:

"Disciplinary proceedings should be instituted only for violation of standards of conduct defined in advance and published through such means as a student handbook or a generally available body of university regulations. Offenses should be as clearly defined as possible, and such vague phrases as 'undesirable conduct' or 'conduct injurious to the best interests of the institution' should be avoided. Conceptions of misconduct particular to the institution need a clear and explicit definition." Statement on The Academic Freedom of Students, 51 A.A.U.P.Bull., 447, 449 (1965).

See Van Alstyne, "Student Academic Freedom and the Rule-Making Powers of

Public Universities: Some Constitutional Considerations", 2 Law in Transition Quarterly 1, 2–6 (1965), and Van Alstyne, "The Student as University Resident", 45 Denver L.J. 582, 592–593, nn. 23, 24 (Special 1968). The subject is discussed extensively in a "Symposium: Student Rights and Campus Rules", 54 Calif.L.Rev. 1 (March, 1966), and specifically therein in Linde, "Campus Law: Berkeley Viewed from Eugene", 54 Calif.L.Rev. 40, in which the efforts to develop a student conduct code at the University of Oregon are discussed in detail. I am not persuaded that the impossibility or inadvisability of the task must be accepted so readily when important Fourteenth Amendment and First Amendment guarantees are at stake.

■ For the reasons stated, and upon the basis of the entire record herein, I conclude that the constitutional doctrines of vagueness and overbreadth are applicable, in some measure, to the standard or standards to be applied by the university in disciplining its students, and that a regime in which the term "misconduct" serves as the sole standard violates the due process clause of the Fourteenth Amendment by reason of its vagueness, or, in the alternative, violates the First Amendment as embodied in the Fourteenth by reason of its vagueness and overbreadth.

I have said that these doctrines are applicable "in some measure". It is neither necessary nor wise presently to decide whether they are applicable to disciplinary proceedings in which the range of possible sanctions is mild, such as the denial of social privileges or a minor loss of academic credits or perhaps expulsion from a specific course or perhaps a brief suspension. Nor is it necessary or wise presently to decide whether the standards of vagueness and overbreadth are to be applied as stringently to university regulations of conduct as to criminal statutes in non-university life. Nor is it necessary or wise presently to decide whether these standards are to be applied with equal stringency in every phase of the life of the university; in non-university society, it appears that they are not applied with equal stringency to economic regulations, regulations of speech or assembly, public employment, penal institutions, court room decorum, the military establishment, and other situations; it may be that within the university community the standards may permissibly apply differently to the teacher's control of the classroom, demonstrations, dormitory life, picketing, parking regulations, and decorum in disciplinary hearings.

■ The judgment here declared is that a standard of "misconduct", without more, may not serve as the sole foundation for the imposition of the sanction of expulsion, or the sanction of suspension for any significant time, throughout the entire range of student life in the university.

### Chapter 11.02, Laws and Regulations of the University of Wisconsin

■ I turn, then, from the defendants' contention that the term "misconduct" alone is sufficient to support the imposition of serious disciplinary sanctions for the behavior which allegedly occurred on the campus on October 18. I turn to the only university rule or regulation, then in existence, which defendants continue to assert as a basis for such disciplinary sanctions. This is Chapter 11.02 of the Laws and Regulations of the Madison campus of the University of Wisconsin, which provides:

*"Scope of Student Freedom.* Students have the right, accorded to all persons by the Constitution, to freedom of speech, peaceable assembly, petition and association. Students and student organizations may examine and discuss all questions of interest to them, and express opinions publicly as well as privately. They may support causes by lawful means which do not disrupt the operations of the University, or organizations accorded the use of University facilities."

The language of Chapter 11.02 does not lend itself readily to the construction that it is a prohibitory regulation. When it appeared in this action, nevertheless, that the defendants viewed it as a prohibition and that they intended to persist in disciplinary proceedings for alleged violations of the prohibition, I considered myself, as the district judge, constrained to view it as an "order made by an administrative board or commission acting under State statutes", 28 U.S.C. § 2281. Viewed as an "order" I considered it of statewide import. Since an injunction against its enforcement was being sought upon the ground that it violates the Constitution of the United States, I considered that the issue required the convening of a three-judge court. The Chief Judge of the Circuit disagreed. In an order entered herein declining to convene a three-judge court, the Chief Judge commented in part as follows with respect to Chapter 11.02:

"It is not a regulation, but merely a statement of the rights of students. It contains no proscriptions or sanctions. Nor is it compulsory * * *. [W]e are not concerned here with a statute or University regulation requiring a student to perform an act, i. e., enroll in a compulsory military training course of instruction, or precluding the admission or enrollment of a student because of race. We are reviewing a so-called regulation which is merely a broad declaration of rights extended to students of the University of Wisconsin, whose support of causes is limited to the use of 'peaceful means which do not disrupt the operations of the University, or organizations ac-

corded the use of university facilities.' "

The disposition of the challenge to Chapter 11.02 was left to the single district judge.

The resulting situation is anomalous. Under the view reflected in the comments of the Chief Judge of the Circuit, Chapter 11.02 is not available to the defendants as a basis for disciplinary action. However, it is alleged (obviously not frivolously, as appears from the exhibits attached to the complaint and from exhibits received at a hearing on an application for temporary restraints) that the defendants do in fact assert that Chapter 11.02 is a prohibitory regulation which may serve as a basis for disciplinary action; counsel for the defendants represent that defendants intend so to employ and apply Chapter 11.02. Under the circumstances, I will construe Chapter 11.02 as if it forbids students to "support causes by means which disrupt the operations of the university, or organizations accorded the use of university facilities." [9]

Faculty Document 104, embodying Chapter 11 of the Laws and Regulations of the University of Wisconsin (Madison campus), was approved by the faculty December 12, 1966 (Defendants' Exhibit 1, received at a hearing on the application for a temporary restraining order). Chapter 11 is entitled "University Policies on Use of Facilities and Outside Speakers", and it consists of 15 sections, some of which are entitled: "University Policy on Student Freedom", "Policy of the Board of Regents on Student Freedom", and "Regulation of Student Po-

9. Conceivably, viewed as a prohibition, Chapter 11.02 could be construed only to forbid students to "support causes by *unlawful* means which disrupt the operations of the university, or organizations accorded the use of university facilities." However, the actual language is: "They may support causes by lawful means which [means] do not disrupt * * *." The most reasonable construction is that it was intended to view with disfavor those who support causes by lawful means which do disrupt. Thus I conclude that, viewed as a prohibition, Chapter 11.02 forbids students to support causes by otherwise lawful means if these means disrupt the operations of the university. However, even if it were construed as prohibiting only "unlawful" means which disrupt, my conclusion concerning the vagueness or overbreadth would be unchanged.

litical Activity". Chapter 11.02[10] is entitled "Scope of Student Freedom". Moreover, the language of Chapter 11.02, under challenge here, expressly deals with the means by which students may "support causes". Therefore, Chapter 11 in general and Chapter 11.02 in particular are addressed to the area of First Amendment freedoms, as distinguished, for example, from regulation of automobiles on the campus or from establishing academic requirements for a degree. In this area, when the potential for the imposition of serious sanctions is present, the standards of vagueness and overbreadth are unquestionably applicable; whether with a stringency equal to that operable in the criminal law it is not necessary to decide.

Obviously it is not a simple matter to draft a regulation which deals with means by which "causes" are supported or opposed, and which undertakes to prohibit those means unprotected by the First Amendment without impairing those which are so protected, and which also avoids the vice of vagueness. I appreciate that those who drafted and approved Chapter 11.02 may reasonably have supposed it sufficient to use a general phrase, such as "lawful means which do not disrupt the operations of the university", and allow its narrower meanings and scope "to be hammered out case by case * * *." Dombrowski v. Pfister, 380 U.S. 479, at 487, 85 S.Ct. 1116, at 1121, 14 L.Ed.2d 22. But in the view I have taken, expressed in the preceding section of this opinion, such vagueness or overbreadth, or both, are impermissible in the First Amendment area when the potential of serious disciplinary sanctions exists. When the standards of vagueness and overbreadth are applied to Chapter 11.02, however mildly, I am obliged to find it invalid. Neither the element of intention, nor that of proximity of cause and effect, nor that of substantiality, for example,

is dealt with by its language. Nor does it contain even the most general description of the kinds of conduct which might be considered disruptive of the operations of the university, nor does it undertake to draw any distinctions whatever as among the various categories of university "operations".

I conclude that Chapter 11.02 is unconstitutionally vague.

 Assuming, again with difficulty as was true with respect to "misconduct" as a standard, that the term "lawful means which do not disrupt the operations of the university" is sufficiently definite to avoid the vice of vagueness, I conclude that it is overly broad. As explained above (at page 985), when the end can be more narrowly achieved, it is not permissible to sweep within the scope of a prohibition activities that are constitutionally protected free speech and assembly. And one may attack such an overly broad prohibition although his own conduct may have been constitutionally punishable had the rule been more narrowly drawn. In such a situation, "possible applications of the [rule] in other factual contexts besides that at bar" may be taken into account in appraising the rule's inhibitory effect upon First Amendment freedoms. NAACP v. Button, 371 U.S. 415, 432, 83 S.Ct. 328, 337, 9 L.Ed.2d 405.

A "possible application" of Chapter 11.02 in a practical, realistic factual context is its application to the organizing of a mid-day campus mass meeting, otherwise lawful, as a "means" of demonstrating "support" for the "cause" of peace or civil rights. If a substantial number of students are attracted to the mass meeting and absent themselves from classes scheduled at that hour, the "operations of the university" may well be "disrupted".

---

10. "Section 11.02" might be a more appropriate designation than "Chapter 11.02", since 11.02 is a section of Chapter 11. However, it is referred to in some pleadings and other documents as "Chapter 11.02" and so this designation has been employed in this opinion.

Another "possible application" of Chapter 11.02 to a practical and realistic factual context is its application to an otherwise lawful campus meeting of a group to support a cause which is so offensive to others that the latter are moved to physical attack upon those in attendance. See Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L. Ed. 1131. The meeting may well be a means which disrupts the operations of the university.

I conclude that Chapter 11.02 violates the First Amendment, as embodied in the Fourteenth, in that its prohibitory scope is overly broad.

The judgment is to declare that Chapter 11.02 is unconstitutional and invalid by reason of its vagueness and overbreadth.

### Prayer for Injunctive Relief

■ I have declared herein that Chapter 11.02 is unconstitutional and invalid. I had previously temporarily enjoined its enforcement. I conclude now that its enforcement should be permanently enjoined.

■ I have also declared herein that a standard of "misconduct", without more, may not serve as the sole foundation for the imposition of the sanction of expulsion, or the sanction of suspension for any significant time, throughout the entire range of student life in the university. I had not previously temporarily enjoined its use and, as the complaint alleges, it apparently has in fact been used since October 18, 1967, as the basis for the imposition of the sanction of expulsion. For reasons which I am about to explain, I conclude that I should not presently prospectively enjoin the use of "misconduct" as a standard for the imposition of disciplinary sanctions by the university and that, for the present, the use of this standard for the imposition of disciplinary sanctions by the university should be permitted to await judicial review, case by case, following the imposition of the sanction.

At the time I was called upon to determine whether the defendants should be temporarily restrained from employing "misconduct" as a standard for the imposition of disciplinary sanctions, I made the following comments in an opinion and order entered December 11, 1967:

"If the temporary restraining order is entered, further use of what the plaintiffs characterize as 'the common law-type doctrine of "misconduct" as part of the inherent power' of the faculty will be stayed with respect to the October 18, 1967, incident.

"The significance of such an order cannot be evaluated without mention of the pendency herein of another motion for an order for temporary reinstatement of three students who are alleged to have been expelled by the university on November 30, 1967. The expulsions, presumably, were an exercise of the asserted power, whether inherent or statutory, to discipline pursuant to 'common law-type doctrine of "misconduct". * * *'

"Moreover, although the temporary restraining order presently to be decided upon would be limited by its terms to the October 18, 1967, incident, it would be idle to suppose that its implications would be overlooked. The point has not been developed as yet in pleadings, exhibits, testimony, briefs, or oral argument, but my present understanding is that much regulation of student conduct at the University of Wisconsin, entirely apart from the October 18 incident, rests upon this assertion of power in the faculty to proceed under a 'common law-type doctrine of misconduct.'

"My understanding, further, is that the students who are and who have been the subjects of the disciplinary proceedings growing out of the October 18, 1967, incident enjoy a right of appeal within the university, and, as defendants appear to concede, may seek review in an appropriate court thereafter. In this opinion, I have expressed doubts concerning the constitutional adequacy of these remedies. However, with respect to the balancing

of immediate interests which would be affected by the issuance of a temporary restraining order, I conclude that the adverse effects upon the plaintiffs which would flow from the denial of the temporary restraint are outweighed by the adverse effects upon the university as an institution which would flow from granting it."

Since those words were written, I have had the benefit of extensive briefing by counsel. Since the time at which that briefing was completed, I have consciously refrained from entering this opinion and order, in the hope that all those concerned, including the court, might gain some additional insight into the problem.

Logic would seem to require that the declaration of invalidity with respect to the standard of "misconduct" be accompanied by injunctive relief. As I have said above (pages 984–985), this prospective, anticipatory, wholesale method of attack upon vague and overly broad prohibitions has been vindicated by the Supreme Court. The principal reason for permitting this method of attack—as distinguished from retrospective, case by case, review of the validity of prohibitions, as actually applied—is said to be that the mere presence or existence of such prohibitions in the area of First Amendment freedoms may have a "chilling effect" upon the exercise of these freedoms, Dombrowski v. Pfister, 380 U.S. 479, 486–487, 85 S.Ct. 1116, 14 L. Ed.2d 22; NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405, which are accorded an exalted and prime position in the constellation of constitutional values.

Whatever the apparent dictates of logic, the same considerations which prompted me to withhold the temporary injunctive relief sought with respect to the "misconduct" standard prompt me now to withhold permanent injunctive relief with respect to this standard.

To hold, as I have held herein, that the university may not escape the necessity to formulate reasonably definite and narrow regulations, at least in some areas of student life and at least with respect to the imposition of serious sanctions, will itself require a considerable readjustment within the university. To take a second step—that is, to confront the university with a sudden application of the tests of vagueness and of overbreadth in a prospective, anticipatory, and wholesale manner—is to impose too radical a transitional strain upon the institution. It is not a matter of record in this action whether the university has anticipated the judicial declarations contained herein. But even assuming that it has done so to a degree, it is unreasonable to suppose that there has been sufficient opportunity for it to review the framework of its laws and regulations in the light of these judicial declarations.

In the non-university society, the regulation of conduct is reflected in a complex of legislative enactments, administrative orders and regulations, common law rules, and judicial declarations which have developed over many years by lawmakers aware or presumably aware that their handiwork was subject to constitutional scrutiny. To apply that scrutiny to a given statute or ordinance, for example, involving First Amendment freedoms, to apply it at the instance of a challenger whose own conduct is unprotected by the First Amendment, to find the statute or ordinance vague or overly broad, and to declare it invalid and to enjoin its enforcement, is strong medicine but is considered to be justified in terms of the overriding importance of freedom of expression in our society. Dombrowski, supra, 380 U.S. at 486–487, 85 S.Ct. 1116. Presumably, the consequences, though serious, are reparable. The particular statute or ordinance, representing a small part of the total complex of rules, may be redrafted and reenacted, and the hole filled.

But historically the regulation of conduct within the university has been the handiwork of lawmakers who have had little reason to suppose that it would be subjected to constitutional scrutiny, at least in substantive terms. Not only to

subject it to such scrutiny, as I have held it must be, but simultaneously to recognize special rules of standing to challengers and to enjoin enforcement of vague or overly broad regulations, is too strong medicine. Its effects cannot immediately be perceived. Whether the resulting holes in the complex of the university's regulations of conduct would be few and minor and readily filled, or numerous and major and difficult to fill, cannot be evaluated by this court on this record. A reasonable time must be permitted for the university to review its situation. Even so, it will be necessary to compress into a very short interval a process which has required many years in non-university society. For the present, to grant injunctive relief and to leave the university defenseless, so far as its regulation of conduct is concerned, would be to permit, and possibly to encourage, a situation in which many values, including the exercise of First Amendment freedoms themselves, might be impaired.

I have concluded that injunctive relief with respect to the application of the standard of "misconduct", without more, should be denied in this action, and that the plaintiffs and the members of their classes should be left to seek judicial review of the validity of this standard retrospectively, case by case, as it has actually been applied.

In the future and after a reasonable time, depending of course upon intervening rulings by superior courts, this court will be prepared to afford injunctive relief to parties who may seek it, consistently with the judicial declarations contained herein.

Accordingly, it is hereby ordered and adjudged:

1. that a standard of "misconduct", without more, may not constitutionally serve as the sole foundation for the imposition, by the University of Wisconsin at Madison, of the sanction of expulsion, or the sanction of suspension for any significant time, throughout the en-

tire range of student life in the university;

2. that Chapter 11.02 of the Laws and Regulations of the University of Wisconsin at Madison is unconstitutional and invalid because it violates the Fourteenth Amendment to the Constitution of the United States by reason of its vagueness and overbreadth; and

3. that the defendants, and each of them, and their agents, assistants, employees and successors are hereby permanently enjoined from further use, operation or enforcement of Chapter 11.02 of the Laws and Regulations of the University of Wisconsin at Madison.