**Dan SULLIVAN, by next Friend Daniel H. Sullivan, Michael Fischer, by next Friend, George David Fischer, et al., Plaintiffs,**

v.

**HOUSTON INDEPENDENT SCHOOL DISTRICT, the Board of Trustees of the Houston Independent School District, the Superintendent of the Houston Independent School District and Mr. Coy P. Stewart, Principal of Sharpstown High School, Defendants.**

**Civ. A. No. 69–H–266.**

United States District Court
S. D. Texas,
Houston Division.

Nov. 17, 1969.

---

Dixie, Wolf & Hall, Robert E. Hall, Houston, Tex., for plaintiffs.

Reynolds, White, Allen & Cook, Grant Cook, Houston, Tex., for defendants.

## MEMORANDUM OPINION

SEALS, District Judge.

This action was instituted on behalf of two Houston high school students who were expelled from Sharpstown Junior/Senior High School for the remainder of the 1968–1969 term because of their involvement in the production and distribution of a "newspaper" called the *Pflashlyte* (see appendix A.) which criticized school officials. The complaint was filed pursuant to 42 U.S.C.A. § 1983 and 28 U.S.C.A. § 1343(3) and it prayed for an injunctive order reinstating the two students and also for declaratory and injunctive relief in an attack against the regulations of the Houston Independent School District pursuant to the Declaratory Judgment Act, 28 U.S.C.A. § 2201, and Rule 23 of the Federal Rules of Civil Procedure governing class actions.

### I.

Sharpstown Junior/Senior High School is one of Houston's newest schools having opened only a year ago. Sharpstown is a large school with age levels varying from the seventh to the twelfth grade. This first year for Sharpstown was also the first experience for Mr. Coy P. Stewart as principal of a senior high school; he had just completed three years as principal of McReynolds Junior High when Sharpstown opened.

Dan Sullivan and Mike Fischer were seniors at Sharpstown during this first year—the 1968–1969 school term. Dan had attended Bellaire High School the previous year and Mike had gone to Lee High School. Both were "B" students. Their conduct records reflect a few minor infractions but neither student appears to have been a discipline problem. In fact, their conduct grade was "good." Their school records and their actions

before this court point to the conclusion that Dan and Mike are rather typical young American men of high moral character.

After their first several months at Sharpstown, Dan and Mike along with some other students became concerned with the absence of any express school regulations governing student conduct. The complaint was, in essence, that a student never knew when he was violating "regulations" since no rules had ever been written down and distributed. Dan, for instance, was told that wearing a neckerchief around his neck violated "school regulations." Confusion also existed concerning the use of a park across from the school before classes began in the morning. Sometimes it was prohibited and sometimes it was not.

Concern for this problem led to the organization of a "rally" after school one day in a nearby park. Students and teachers were present and they all sat on the grass and listened to speeches by students who used the chance to air some grievances. The discussion was interrupted by the physical interference of certain Sharpstown High athletic coaches who threw books around the park, ripped up students' notebooks and accused students of being Communists and Fascists.

There were other incidents of harassment by gym coaches which added to the list of student complaints. On one occasion, Dan Sullivan was called into a coach's office and subjected to strong verbal abuse. When Dan stepped aside as someone entered the office door so that he had to lean against one of the coach's desks, the coach ordered him to get off that desk or he would get his "block knocked off."

In addition, it appears that some of the students in Mike Fischer's gym class who attended the rally were given "grade cuts." Mike's gym instructor later informed him that because of the present lawsuit Mike would receive an "F" in the course if the instructor could "get away with it."

After the incident at the "rally," some of the students decided to wear small American flags in their shirt lapels as a show of patriotism. Dan Sullivan had called the Houston office of the Federal Bureau of Investigation to ask if this was an acceptable way to display the flag and upon being assured that it was proper, he wore a flag to school. Dan was informed by a coach to remove the flag on penalty of suspension from school. The flag, the coach said, "was disruptive."

Another incident concerned solicitations for various fund-raising projects during school hours. Dan, Mike and a friend named Larry Craven approached Mr. Stewart about sponsoring a Red Cross drive for the starving people of Biafra. Dan had called the American Red Cross and they had expressed enthusiasm for the project. Mr. Stewart told the boys that such a program could not be allowed because it was explicitedly prohibited by the downtown office to have any kind of solicitation from students during school time. The boys suggested small unobtrusive cans with slots to be placed on lunch tables. Stewart said this too was against "regulations." Dan later called the downtown office and was told that it was up to the principal to decide which fund drives should be allowed within the school.

Several weeks later, Mr. Stewart announced that as part of the senior project the school was to have a fund drive to collect $500.00 for the purchase of tropical plants, to be placed in a large planter box. Each student was expected to contribute twenty-five cents. Dan was asked by his physics teacher to make his contribution, not only during class time, but while an exam was in progress. When he refused to contribute saying it seemed somewhat hypocritical, Dan was lectured by the teacher and was told that his mind was being taken over by Communists.

Some time after these incidents, Mike and Dan decided they would put together a "newspaper" to voice their dissatis-

factions and beliefs. Both were acquainted with one Walter Spinks who had attended Lee High School the year before and was then a freshman at the University of Houston. Spinks said it would be possible to have the printing done at the University's print shop. Only campus-approved organizations had access to the print shop but Spinks knew some people who were members of the Students for a Democratic Society (SDS), which was a University approved organization, who would let them use the SDS name on a University work order so that the campus print shop would do the printing.

Dan drafted the first "newspaper" which was more of a short introductory issue for the forthcoming first edition of the *Pflashlyte*; it set out the aims and goals of the editors. The boys took the stencil and money for the printing to the University of Houston and while there Mike and Dan attended a meeting of the SDS not only out of curiosity but also to be sure the printing would be done. The meeting was held in the World Affairs room of the student center and Mike and Dan soon found that SDS was very much against their beliefs. They attended three other meetings but only to insure that their "newspaper" would be printed.

When the copies of the introductory issue were received from the printer, the boys found that the letters SDS had been printed at the bottom of each page. Since they wanted no connection with this organization, they cut off the bottom portion of each of the 125 sheets so as to remove the SDS initials.

The stencil for the second "newspaper", the first one bearing the name *Pflashlyte*, was delivered to the printer soon after the first one. The boys were able to pick up these copies the day after they received the copies of the first issue and so only a few copies of the "introductory" edition were ever distributed. When the second edition was finished Mike and Dan found that it had been printed on both sides of legal size paper instead of on two sheets. They

had ordered 2,000 sheets thinking they would get 1,000 copies but now they had 2,000 copies. Also, the name "Students for a Democratic Society" was printed on the back side in a position high enough on the page so that it could not be cut off without removing a portion of the printing on the front side. On the third edition, the letters SDS were in the middle of the reverse side.

The second edition was written rather hurriedly and since the boys wanted to try to produce something with a higher standard of quality, they spent more time on the third edition. Several books on constitutional law and American government were obtained from a local public library and Mike and Dan included research from these books in their "newspaper." One such book was Mr. Justice Douglas' *The Living Bill of Rights*. Others included a classroom textbook entitled *American Government* by Cloudner; the *Bill of Rights Reader* by Konvitz; and a third called *Leading Constitutional Cases*. Their research efforts were in the evenings and were not part of any school courses.

Mike and Dan began distribution of the introductory paper on February 27, 1969 and then continued on the 28th. The second edition was ready by the 28th so the students' efforts were directed at distributing it on that day, which was a Friday, and then again during the early part of the following week. Several other students helped Mike and Dan distribute the "newspaper" and they were instructed to not hand out the paper on school grounds or during school hours. They were also asked by Mike and Dan to tell students not to take the paper into the school with them but if they had to do so, to keep it in a notebook so that it would be out of sight. Distribution began in Landsdale Park just across the street from Sharpstown High. As students passed by on their way to classes they were given copies. Issues were later handed out at Sharpstown Shopping Center and at various shops where students were known to congregate. About 1,000 copies of the

second edition were eventually distributed. Most students did as Mike and Dan requested but others did not. In one boys' restroom, a stack of papers was found with a sign above it saying "take one." Copies were also placed in a paper towel dispenser and some were found inside sewing machines in a girls' homemaking class.

It also appears that some copies were found in classrooms during school hours. Teacher Don Ellisor found a student reading the *Pflashlyte* during class when she should have been working on an assignment. He took up the paper without disrupting the class. An English instructor, Mrs. Jeannine Wallace, had to take up papers from two students who were reading it during class. One student had laughed out-loud as she read and the teacher felt the need to take the paper from her. Mrs. Wallace had in the past taken up copies of the school-sponsored newspaper, *The Torch*, which students read in class. Mrs. Wallace also noticed somewhat more congestion in the halls as students made their way from one class to another.

Mrs. Woodie Kendall, a seventh grade teacher at Sharpstown, took up a copy of the "newspaper" from five boys who were reading it before class began for their homeroom period. She also noticed more congestion in the halls and added that movement through the school had been a problem since the school had opened because the halls were rather narrow. Mrs. Cyril Hosley, a typing instructor, observed an unusually large number of students tardy in arriving for class on February 28, 1969 and the following week, but she did not know a specific reason for the tardiness. Mrs. Hosley did see copies of the *Pflashlyte* in her room but did not take them up as they had not created any disturbance.

Math instructor Sidney Johnson was interrupted during a lecture by a student who twisted around in his seat to get a look at a copy of the paper held by the student behind him. Johnson immediately confiscated the copy, and sent both boys to the principal's office. An-

other of Johnson's classes was interrupted when a student tried to ask a question about the newspaper.

Charles Smith, also a math teacher at Sharpstown, was interrupted during his class lectures. Students wanted to talk about the *Pflashlyte* as often as twice a day for two or three days and then only once a day thereafter.

Assistant Principal Jackson attempted to summarize the disruptive effect on the school which resulted from the distribution of the *Pflashlyte*:

Q. During that one-week period was there any disruption of the ordinary routine of the school or operations of the school which you believe is attributable to the fact that this paper was being circulated in the school? * * *

THE WITNESS: Sir, it will be virtually impossible for me to pinpoint a single incident. It would be my interpretation of the general attitude of the student body, which I couldn't say that at such-and-such a time that happened. I work with it every day.

THE COURT: You have a feeling for it?

THE WITNESS: Yes, sir, I do.

THE COURT: You have a feeling that the students' attitude was a certain way?

THE WITNESS: There seemed to be a difference in the attitude is the way I would say it, a marked difference.

Q. (By Mr. Cook) In what way was it different from the ordinary attitude?

A. Well—

Q. Was it better or worse:

A. Indifferent. I couldn't describe it as being better. There seemed to be, the attitude seemed to be, I don't know if its going to say what I, more concerned with something else. I wanted to say that you often see a group in the

hall standing together and talking in between classes, passing time. You might see a group, a large group gathering at a lunch table. This in itself may or may not be attributed to something like this. It's difficult to say. There seemed to be, if I might describe it this way, there seemed to be something of concern that was generally among the student body.

Q. Would you say that there prevailed an attitude of preoccupation of something that doesn't ordinarily go on in the school building? * * *

THE COURT: Do you know a synonym for preoccupied?

THE WITNESS: I would say that they had been, let me think a minute. They had something on their minds that was causing them to be of great concern. That's my own choice of words.

Tr. at 550–53.

Sharpstown's principal, Mr. Coy P. Stewart, first learned of the presence of the *Pflashlyte* in the school building on Friday, February 28, 1969, the first day of large scale distribution. He received a copy of the short "introductory" issue in the mail and soon after classes began a teacher brought in a copy of the second edition which had been taken from a student. As more and more copies came to the administrative office, not only from teachers but from students, he became quite anxious about the situation and resolved that the students responsible would be expelled immediately. Stewart launched an investigation into the matter and he and other administrative personnel questioned students throughout the school trying to learn the identity of *Pflashlyte's* editors and distributors. He soon learned that two boys had been handing out the "newspaper" in Landsdale Park before school started in the morning. Stewart obtained descriptions of the boys as his investigation continued into the following week. By the middle of the week Stewart began to suspect Dan Sullivan and Mike Fischer. On Wednesday, March 5, 1969, Dan was called in by Mr. Stewart who began asking him random questions about his family, his teachers and about a theme paper Dan had written for an English class. It later developed that other Sharpstown students at the direction of administrative personnel had quietly filed past the open door of Stewart's office so that Dan could be viewed and identified as one of those who had distributed the *Pflashlyte*. Mr. Stewart made no mention of the "newspaper" to Dan.

On that Friday, March 7, 1969, Dan and Mike were called in separately to talk with Mr. Stewart and Assistant Principal Jackson. Both boys admitted that they had distributed the paper. Stewart advised them that their actions were serious violations of "school regulations" especially because of their involvement in a "secret organization." However, neither boy was informed of what disciplinary action, if any, would be taken nor were they offered the opportunity to cease their actions so as to mitigate their punishment.

The next contact Mike had with the administration was Wednesday, March 12, 1969. He came to the principal's office and found that his father was already conferring with Mr. Stewart. Mike was told he was being expelled for the remainder of his senior year. Dan was told the following day that he too, was expelled. Stewart phoned Dan's mother who came to the school for a conference. She asked if Dan could stay in school if the paper were discontinued but Stewart said this was too serious. Mike Fischer spoke to Mr. Stewart again on Thursday, the 13th, and offered to cease all activities concerning the "newspaper" but Stewart refused saying Mike's "attitude" was bad.

It was clearly established that both boys were expelled solely for their involvement with the *Pflashlyte* and not for any previous misconduct as the defendants have argued.

Mr. Stewart did indicate to both boys that he would try to help them obtain admittance to another Houston High School. Mrs. Fischer went to see the principal at Lee High School the day after Mike was suspended but was told by the Assistant Principal that the principal was out of town and that he had left instructions to admit no new students except those who had just moved into the district. She also called Bellaire High School but was unable to contact the principal. St. Thomas High School refused acceptance of a transfer because it was too late in the school year and Marion High School gave Mrs. Fischer the same answer. Mrs. Fischer also telephoned Mr. Myrl Johnson, Assistant Superintendent for Secondary Schools, in an effort to get Mike back in school. She learned nothing more than did Mike and Dan when they went downtown to see Mr. Johnson. He told them that he affirmed Mr. Stewart's action and that the only recourse for the boys was to try to obtain admittance to another school. Johnson said that both the sending and receiving principal had to approve a transfer and that Mike and Dan should just work hard at seeing principals until they found one that would accept them. Johnson suggested that they try Davis High School and Madison High School, even though both schools are on the other side of town from Sharpstown. Johnson also offered to try and help the boys in their effort to find a principal who would accept them but that he could not help them in any other way even though he had the authority to overrule Mr. Stewart's action. Johnson admitted to Mike and Dan that he was afraid their chances of getting into another school were slim.

## II.

Plaintiffs' complaint charged that these students were expelled from school in violation of their rights to freedom of speech and to due process of law as provided for in the First and Fourteenth Amendments to the United States Constitution. Plaintiffs also prayed for the entry of a judgment declaring unconstitutional the rules and regulations of the Houston Independent School District which were employed to suspend these students on the grounds that they are vague and overbroad.

The defendants responded by arguing that their actions were justified in that the "newspaper" created such "disruption" to the school's daily operation that the result was "complete turmoil" among students. Further, defendants contend that the contents of the "newspaper" amounted to an immediate advocacy of and incitement to disregard school administrative procedures and policies and that the paper was calculated to encourage insubordination to school authority on the part of other students. Defendants assert that their actions were justified in light of information that had been received to the effect that two so-called radical organizations, the Students for a Democratic Society and its high school affiliate, the Student Union for Democratic Schools, were attempting to "infiltrate" Houston high schools.

Shortly after this suit was filed, this court entered a Temporary Restraining Order which required that the students be reinstated in school until a hearing could be held and the factual circumstances surrounding the expulsion explored.

On April 9, 1969 hearing began to consider the plaintiffs' application for entry of a preliminary injunction. At that time an Order was entered pursuant to Rule 65(a) (2), Federal Rules of Civil Procedure, that the action on the merits be advanced and consolidated with the hearing on the application for a preliminary injunction in an effort to expedite the final determination of the case.

Before testimony began, defendants presented its motion to dismiss in whole or in part and its plea in abatement. Both motions were carried along with the case. After five days of trial, this court entered its informal Findings of Fact and granted a Preliminary Injunc-

tion to the effect that the two minor plaintiffs were to remain in school without the imposition of disciplinary action regarding the publication and distribution of the "newspaper." Further, defendants were enjoined from disciplining the minor plaintiffs for the publication or distribution of other written materials away from school premises. (see Appendix B.)

■■ The court has also considered defendants' motion to abate this action until plaintiffs have exhausted all available administrative remedies. Defendants' motion is overruled on two grounds: (1) The doctrine of exhaustion of administrative remedies is not applicable to an action under Section 1983, Title 42, United States Code. Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). See also General Order of Student Discipline, 45 F.R.D. 133–143–144 (W.D.Mo. 1968); (2) It also appears that the two minor plaintiffs did in fact avail themselves of all the administrative remedies available to them. Assistant Superintendent Johnson testified that the boys' only recourse after their suspension was to attempt to persuade a high school principal to accept their transfer. The evidence is clear that the minor plaintiffs and their parents made reasonable attempts but were unsuccessful. Johnson had said he thought their chances were slim and apparently he was correct. It does not appear that an appeal to the central administrative office was a procedure available to plaintiffs. But since Johnson informed Mike and Dan that he concurred in Mr. Stewart's ruling, it appears that such a procedure would probably have been fruitless.

■ Action was deferred by the court on defendants' motion to dismiss. The first ground urged in support of this motion is that this court has no jurisdiction over that part of the case dealing with the alleged deprivation of procedural due process in the absence of any denial of substantive constitutional rights by defendants. The only authority presented by defendants is the recent decision of the United States Court of Appeals for the Eighth Circuit in Freeman v. Gould Special School District, 405 F.2d 1153 (8th Cir. 1969). That case concerned the due process claims of certain teachers who were dismissed from their jobs without having received minimal standards of procedural due process. The instant case involves the dismissal of students from school—an entirely different matter. A school board's employment practices are irrelevant considerations in an analysis of its relationship with its students. Since this court is aware of no other reason why plaintiffs may not properly assert a lack of due process in the procedure followed in dismissing these students from school, the defendants' motion to dismiss that part of the complaint is denied. See, e. g. Kelley v. Metropolitan Bd. of Education, 293 F.Supp. 485 (M.D.Tenn. 1968).

■ Defendants have also moved to dismiss that part of the complaint which has been designated a class action. Plaintiffs have requested that they be allowed to maintain this suit as a class action pursuant to Rule 23, Federal Rules of Civil Procedure. Plaintiffs have designated a class composed of all the students presently enrolled in the secondary schools of the Houston Independent School District. Defendants contend that this designation is not proper under Rule 23 because the majority of Houston secondary students are not in sympathy with the views or methods of these plaintiffs and are, therefore, not "similarly situated." This contention misses the point. All of the members of this class are subject to the same regulations of the Houston School District which have been alleged to be unconstitutional on their face and as applied. It is irrelevant to speculate how many students might need to invoke the first amendment as protection from offi-

cial sanctions; the fact that each member is subject to the same specific sort of deprivation of constitutional rights as the representative parties is enough. This case is clearly maintainable as a class action pursuant to Sections (a) and (b) (2) of Rule 23. See generally Wright, Class Actions, 47 F.R.D. 169 (1969).

During the period allowed to counsel for both parties for preparation of formal briefs on plaintiffs' claim for permanent injunctive relief, defendants filed a second motion to dismiss. Counsel argues in this new motion that since the minor plaintiffs did return to Sharpstown High School as a result of this court's orders and since both did graduate from that school at the end of the Spring term of 1969, that their causes of action are now moot. Further, defendants argue that inasmuch as the "representative parties" of the class action no longer have a justiciable dispute with defendants, these minor plaintiffs can no longer continue to properly represent this class within the meaning of Rule 23.

█ This court does not agree that the minor plaintiffs' causes are moot. The complaint in this cause expressly requested that the defendants be enjoined from maintaining any formal or informal record reflecting that disciplinary action was ever taken against these students for the acts in question. This question has not been resolved nor was action on it appropriate until the case became ripe for determination of the other prayers for permanent relief. A closely analogous case is Carafas v. La Vallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968) in which the Supreme Court considered the contention that a petition for habeas corpus became moot when the petitioner was unconditionally released from prison:

It is clear that petitioner's cause is not moot. In consequence of his conviction, he cannot engage in certain businesses; he cannot serve as an official of a labor union for a specified period of time; he cannot vote in any election held in New York State; he cannot serve as a juror. Because of these "disabilities or burdens [which] may flow from" petitioner's conviction, he has "a substantial stake in the judgment of conviction which survives the satisfaction of the sentence imposed on him." Fiswick v. United States, 329 U.S. 211, 222, 67 S.Ct. 224, 230, 91 L.Ed. 196 [203] (1946): On account of these "collateral consequences," the case is not moot. Ginsberg v. New York, 390 U.S. 629, 633–634, n. 2, 88 S.Ct. 1274, 1277–1278, 20 L.Ed.2d 195 [200] (1968).

*Id.* at 237, 88 S.Ct. at 1559.

These minor plaintiffs may well suffer "collateral consequences" unless it is resolved by the final judgment of this court that they were wrongfully expelled. One specific example of such consequences would be the increased difficulty in obtaining admission to a college or university that these students might well encounter. The severe disciplinary action taken against these students amounts to a blot on their scholastic records that might well haunt them for years to come. Plaintiffs are entitled to a judgment one way or the other on the propriety of their conduct and at the same time the court is obliged to evaluate the actions of school officials. This evaluation directly involves the designated class as a whole and this court considers these minor plaintiffs to be proper and adequate representatives. Defendants' second motion to dismiss is overruled.

### III.

█ In February of this year, the Supreme Court clarified the constitutional principles governing the rights of school pupils to register dissenting opinions at school and the need for maintaining standards of discipline in public schools. In Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 505, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) the Court reversed the expulsion of a group of high school and junior high students who wore black arm-

bands to class as a silent protest to this Nation's involvement in the war in Vietnam. The majority opinion makes it abundantly clear that students do not shed their constitutional rights when they enter the high school campus:

> In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students. Students in school as well as out of school are "persons" under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State. In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved. In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views. As Judge Gewin, speaking for the Fifth Circuit said, school officials cannot suppress "expression of feelings with which they do not wish to contend." Burnside v. Byars, supra, 363 F.2d at 749.

*Id.* at 511, 89 S.Ct. at 739.

Tinker very clearly applies the first amendment in its full force to the high school campus:

> In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.

*Id.* at 509, 89 S.Ct. at 738.

██ However, as has always been the Court's view of the first amendment, see Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), under *Tinker*, speech and assembly are subject to reasonable restrictions as to time, place, manner and duration:

> The principal use to which the schools are dedicated is to accommodate students during prescribed hours for the purpose of certain types of activities. Among those activities is personal intercommunication among the students. This is not only an inevitable part of the process of attending school. It is also an important part of the educational process. A student's rights therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so "without materially and substantially interfer[ing] with appropriate discipline in the operation of the school" and without colliding with the rights of others. Burnside v. Byars, supra, 363 F.2d at 749. But conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guaranty of freedom of speech.

*Id.* at 512–513, 89 S.Ct. at 739–740.

These limitations are closely analogous to the limitations that have been placed on demonstrations and pickets. Though they are exercising first amendment rights, demonstrators will not be allowed to interfere with normal automobile or pedestrian traffic on public streets or sidewalks because it is also a fundamental right of every citizen to travel free from unreasonable physical interference by others. Traffic is properly regulated by the police because it is said to be a legitimate interest of the public as a whole. See Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968); Shuttlesworth v. Birmingham, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965); Cox v. Louis-

iana, 379 U.S. 536, 85 S.Ct. 453, 13 L. Ed.2d 471 (1965).

The schools, then, should be able to control those activities which relate to or affect education. As the judges of the Western District of Missouri put it their General Order On School Discipline, 45 F.R.D. 133, 145 (1968): "In the field of discipline, scholastic and behavioral, an institution may establish any standards reasonably relevant to the lawful missions, processes, and functions of the institution."

 Clearly then, freedom of speech, which includes publication and distribution of newspapers, may be exercised to its fullest potential *on school premises* so long as it does not unreasonably interfere with normal school activities. Administration can properly regulate the times and places within the school building at which papers may be distributed. Obviously, the first amendment does not require that students be allowed to read newspapers during class periods. Nor should loud speeches or discussion be tolerated in the halls during class time. A proper regulation as to "place" might reasonably prohibit all discussion in the school library. Administration may not, however, apply regulations as to "time" or "place" or "manner" in a discriminatory fashion. In *Tinker*, the school authorities did not prohibit the students from wearing all symbols of controversial significance, but only arm bands, while allowing such things as political buttons. One student even wore a Nazi Iron Cross and was not reprimanded. The Court said:

Clearly, the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible.

393 U.S. at 511, 89 S.Ct. at 739.

 It is also clear that if a student complies with reasonable rules as to times and places for distribution within the school, and does so in an orderly, non-disruptive manner, then he should not suffer if other students, who are lacking in self-control, tend to over-react thereby becoming a disruptive influence. Mr. Justice Douglas' famous quote from Terminiello v. City of Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1948) is particularly important to this issue:

A function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, [citation omitted] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.

 So, a student has the right to express himself while on school premises in a non-disruptive manner, subject to reasonable limitations concerning "time," "place," "manner" and "duration."

But what of off-campus activities? It is not clear whether the law allows a school to discipline a student for his behavior during free time away from the campus. *Compare*, Linde, Campus Law: Berkeley Viewed From Eugene, 54 Calif.L.Rev. 40, 50–51 (1966), *with*, General Order on Student Discipline, 45 F.R.D. 133, 145 (W.D.Mo.1968). In this court's judgment, it makes little sense to extend the influence of school administration to off-campus activity under the theory that such activity might interfere with the function of education. School officials may not judge a student's behavior while he is in his home with his family nor does it seem to this court that they should have jurisdiction over his acts on

a public street corner. A student is subject to the same criminal laws and owes the same civil duties as other citizens, and his status as a student should not alter his obligations to others during his private life away from the campus.

Arguably, misconduct by students during non-school hours and away from school premises could, in certain situations, have such a lasting effect on other students that disruption could result during the next school day. Perhaps then administrators should be able to exercise some degree of influence over off-campus conduct. This court considers even this power to be questionable.

■ However, under any circumstances, the school certainly may not exercise more control over off-campus behavior than over on-campus conduct. Serious disciplinary action concerning first amendment activity on or off campus must be based on the standard of substantial interference with the normal operations of the school.

These principles apply directly to this case. There is no question that these minor plaintiffs were engaged in acts of expression protected by the first amendment; indeed, excepting only oral expression, the publication of a "newspaper" is first amendment activity in its purest form.

The crucial issue, then, is a factual question: did these two students materially and substantially interfere with the requirements of appropriate discipline in the operation of Sharpstown Junior/Senior High School? After hearing all the evidence, this court concluded that the distribution of the *Pflashlyte* had no such effect. Since then, a careful examination of the transcript of the testimony and of the briefs of counsel has not changed that opinion. The interruptions of class periods caused by the "newspaper" were minor and relatively few in number. It is of special significance to note that during the nine school days between the first appearance of the *Pflashlyte* and the expulsion of Mike and Dan, only *one* student "discipline card" was filled out at Sharpstown High which was in any way related to the "newspaper." Moreover that one student was also being reprimanded for several other infractions as well as possession of a *Pflashlyte*.

So called "underground" newspapers have sprung up in high schools all over the United States during the past year. Many have used harsh language and have advocated violence. The *Pflashlyte* was primarily intended as a discussion and comment upon problems affecting student-administrator relations. (see Appendix A.) The writers are generally critical of school policy but the criticism is on a mature and intelligent level. In the introductory issue, it is argued that improvement in the students' relationship with school administrators can be accomplished only through the "sincere cooperation of all factions." "Confrontation" it is stated, "would result in regression rather than progression." These are not the words of one who is calculating to "incite insubordination."

■ Defendants' objections are strongest toward a paragraph in the first issue entitled *Pflashlyte* which is captioned "Edmund's Thoughts." Plaintiffs testified that this was intended to be a sarcastic "speech" by a hypothetical administrator. Although it does appear to hold school officials up to ridicule, its content does not even approach the "fighting words" of Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), which are not protected by the first amendment since they are said to inflict injury by their very utterance. These two young men are subject to laws governing libel, slander and obscenity but it can hardly be concluded that his paragraph amounts to libel or that it is obscene. It is surely no more obscene than the sign hanging in the office of the school athletic coaches which in substance stated [p]ut your heart in this country or get your ass out of it" by use of small pictures of a heart and a donkey substituted for the words they symbolized. The contents of all three issues of the *Pflashlyte* are

plainly the sort of speech protected by the first amendment.

██ The manner in which the paper was distributed by these two students could by no stretch of the imagination be said to have created a state of "turmoil." Both boys were off-campus, they did not hand out papers during school time and they even went so far as to encourage students not to take the paper into the school building and to keep it out of sight if they did so.

If it was the disruption of classes and normal school activities that concerned school officials after the *Pflashlyte* was distributed, then why were those not disciplined who were disruptive? Apparently those unknown persons who placed issues in sewing machines and in paper towel dispensers have gone unnoticed. It is their misconduct in the manner in which they distributed the paper which should have been stopped, not the idea of printing newspapers itself.

Defendants attempt to justify their actions by arguing that an organized student movement is attempting to "overthrow" the Houston school system and that the elimination of this "newspaper" and these students was necessary to prevent further "infiltration." The court will resist the temptation to comment upon this position. At their very best, these considerations are irrelevant. These two boys have not advocated the overthrow of the United States Government or of the Houston school district. Indeed, their most subversive thoughts were about potted plants.

It appears that Mike and Dan were disciplined because school officials disliked the *Pflashlyte's* contents. The Constitution prohibits such action.

### IV.

Plaintiffs also contend that the procedure employed by Stewart in expelling Mike Fischer and Dan Sullivan does not meet minimal standards of procedural due process of law. In the important case of Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir.), cert.

denied, 385 U.S. 930, 82 S.Ct. 368, 7 L. Ed.2d 193 (1961), the United States Court of Appeals for the Fifth Circuit held that school officials are clothed with governmental authority and that if their disciplinary actions can substantially injure an individual, such acts must comply with minimal procedural requirements of due process of law. The court outlined these requirements:

We are confident that precedent as well as a most fundamental constitutional principle support our holding that due process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct. * * * They should, we think, comply with the following standards. The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion under the regulations of the Board of Education. The nature of the hearing should vary depending on the circumstances of the particular case. The case before us requires something more than an informal interview with an administrative authority of the college. By its nature, a charge of misconduct, as opposed to a failure to meet the scholastic standards of the college, depends upon a collection of the facts concerning the charged misconduct, easily colored by the point of view of the witnesses. In such circumstances, a hearing which gives the Board or the administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required. * * * Nevertheless, the rudiments of an adversary proceeding may be preserved without encroaching upon the interests of the college.

*Id.* at 158–159. See Kelley v. Metropolitan County Bd. of Education, 293 F. Supp. 485 (M.D.Tenn.1968); Esteban v. Central Missouri State College, 277 F. Supp. 649 (W.D.Mo.1967); Knight v.

State Bd. of Education, 200 F.Supp. 174 (M.D.Tenn.1961); General Order on Student Discipline, 45 F.R.D. 133 (1968).

■ The high school student perhaps even more than the university student needs careful adherence to concepts of procedural fairness and reasonableness by school officials. See Kelley v. Metropolitan Bd. of Education, supra. As minors they occupy a different status under the law and often are too inexperienced or immature to know how to protect themselves against charges of misconduct. Parents or guardians have legal obligations to children of high school age and common sense dictates that they should be included in any disciplinary action against their children which could result in severe punishment. Indeed it may be even more crucial that proper written notice of charges be provided to parents for often they do not know what has transpired at school. When severe discipline is contemplated —either expulsion or suspension for a substantial time—the student and his parents should be given ample time before the hearing to examine the charges, prepare a defense and gather evidence and witnesses. And, it goes without saying that the disciplining official should endeavor to maintain a neutral position until he has heard all of the facts.

■ Mr. Stewart testified that in his judgment the presence of the "newspaper" was not "in the best interests of the school" under any circumstances. He also said that he resolved to expel the students who were responsible as soon as possible. In the face of such a predetermination, it appears that Stewart saw no real need to afford the students and their parents a chance to present a defense. Mike Fischer's mother was informed over the phone that Mike was being expelled before Mike himself was ever advised that any disciplinary action would be taken. This was the first notice from the school to either Mr. or Mrs. Fischer that Mike was in trouble.

Mrs. Sullivan was asked to come to Mr. Stewart's office for a conference and at that time she was advised that Dan was to be expelled. The purpose of the conference appears to have been only to inform Mrs. Sullivan of the punishment. Both boys were called in for a conference with the principal and assistant principal on the Friday before their expulsion. However, neither was advised that disciplinary action would be taken nor was it made clear exactly why the "newspaper" violated "school regulations."

The suspension of these students provides a practical illustration of the unfairness so often accompanying the imposition of sanctions without adherence to reasonable standards of procedural due process. If Stewart had inquired into the boys' motives and reasons for publishing a critical newspaper then perhaps he would not have acted so hastily. But for some reason the lines of communication were closed. This court, however, considers it the duty of school officials to create and maintain these lines through reasonable and fair procedures whenever severe disciplinary action is considered appropriate.

In light of this court's conclusions that defendants have deprived plaintiffs of their rights under the first amendment and have denied plaintiffs due process of law, plaintiffs are entitled to judgment that they were wrongfully expelled from Sharpstown High School.

### V.

Finally, plaintiffs allege that certain regulations of the Houston Independent School District are unconstitutional under the Supreme Court's "void-for-vagueness" doctrine. This prayer is presented as a class action on behalf of all secondary students of the Houston Independent School District. Plaintiffs seek declaratory relief and injunctive enforcement of their judgment.

■ The Supreme Court's "void-for-vagueness" doctrine has developed two distinct concepts. A statute is scrutinized first to determine if it is "over-

broad"; could a reasonable application of its sanctions include conduct protected by the Constitution? See Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1941). *See generally*, Amsterdam, The Void for Vagueness Doctrine, 109 Pa.L.Rev. 67 (1960).

A statute must also satisfy the "vagueness" standard of Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926):

> [A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process * * *.

See Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

In their General Order on Student Discipline, 45 F.R.D. 133, 146–47 (W.D. Mo.1968), the judges of the Western District of Missouri adopted the following view on this issue:

> Outstanding educational authorities in the field of higher education believe, on the basis of experience, that detailed codes of prohibited student conduct are provocative and should not be employed in higher education.
>
> For this reason, general affirmative statements of what is expected of a student may in some areas be preferable in higher education. Such affirmative standards may be employed, and discipline of students based thereon.
>
> The legal doctrine that a prohibitory statute is void if it is overly broad or unconstitutionally broad does not, in the absence of exceptional circumstances, apply to standards of student conduct. The validity of the form of standards of student conduct, relevant to the lawful missions of higher education, ordinarily should be determined by recognized educational standards.

However, in the case of Soglin v. Kauffman, 295 F.Supp. 978, 990 (W.D. Wis.1968) the court expressly rejected this view: "I cannot agree that university students should be deprived of these significant constitutional protections on so slender a showing." The court concluded that:

> The constitutional doctrines of vagueness and overbreadth are applicable, in some measure, to the standard or standards to be applied by the university in disciplining its students, and that a regime in which the term "misconduct" serves as the sole standard violates the due process clause of the Fourteenth Amendment by reason of its vagueness, or, in the alternative, violates the First Amendment as embodied in the Fourteenth by reason of its vagueness and overbreadth.

*Id.* at 991.

This court is persuaded by the *Soglin* decision. And in this court's judgment, these fundamental concepts of constitutional law must be applied "in some measure" even to high schools. The "measure" should reach only to rules the violation of which could result in expulsion or suspension for a substantial period of time. When faced with such drastic consequences, a high school student has no less a right to a clear, specific normative statement which does not infringe on free expression than does a university student or possibly even the accused in a criminal case. If the punishment could be this severe, there is no question but that a high school student as well as a university student might well suffer more injury than one convicted of a criminal offense. School rules probably do not need to be as narrow as criminal statutes but if school officials contemplate severe punishment they must do so on the basis of a rule which is drawn so as to reasonably inform the student what specific conduct is prescribed. Basic notions of justice and fair play require that no person shall be made to suffer for a breach unless standards of behavior

have first been announced, for who is to decide what has been breached?

■ It is also clear that severe punishment may not be based on a rule which could reasonably be construed to embrace conduct protected by the first amendment. In *Tinker* the Court stated:

> Under our Constitution, free speech is not a right that is given only to be so circumscribed that it exists in principle but not in fact. Freedom of expression would not truly exist if the right could be exercised only in an area that a benevolent government has provided as a safe haven for crackpots. The Constitution says that Congress (and the States) may not abridge the right to free speech. This provision means what it says. We properly read it to permit reasonable regulation of speech-connected activities in carefully restricted circumstances. But we do not confine the permissible exercise of First Amendment rights to a telephone booth or the four corners of a pamphlet, or to supervised and ordained discussion in a school classroom.

393 U.S. at 513, 89 S.Ct. at 740.

At the conclusion of the evidentiary hearing in this case the parties entered the following stipulation:

> The only written rule or regulation of the Houston Independent School District concerning the private publication and distribution of written material by students in secondary schools newspapers which are not published in the name of the school and which do not purport to be published under the auspices of any school is as follows:

The school principal may make such rules and regulations that may be necessary in the administration of the school and in promoting its best interests. He may enforce obedience to any reasonable and lawful command.

It was further stipulated by the parties that Mr. Stewart had not made or announced any rule concerning the private publication or distribution of newspapers at Sharpstown Junior/Senior High School before the facts in question arose.

Lastly, the following was stipulated:

> [T]he rule * * * [quoted above] is construed by responsible officials of the Houston Independent School District to prohibit the type of publication and distribution engaged in by Michael Fischer and Dan Sullivan in February and March of 1969.

■ Since Mr. Stewart had not announced any rules regarding the private publication and distribution of newspapers and since he testified that he based his disciplinary action upon the rule quoted above, it must be assumed that this was the only standard available to students by which they could guide their conduct. The rule is, therefore, a proper subject for evaluation as to its vagueness and overbreadth.[1]

■ Little can be said of a standard so grossly overbroad as "in the best interests of the school." Soglin v. Kauffman, 295 F.Supp. 978, 991 (W.D.Wis. 1968). It cannot be contended that it supplies objective standards by which a student may measure his behavior or by which an administrator may make a spe-

---

1. Although neither party has raised or briefed the issue, it appears highly questionable to this court whether the Board of Trustees of the Houston Independent School District may properly delegate the power to expel and suspend for a substantial period of time to the principal of a school. Article 2904, Vernon's Annotated Texas Civil Statutes, provides that the trustees of an independent school district shall have the power to suspend a pupil found guilty of "incorrigible con-

duct." It does not appear that Texas law expressly grants such power to principals and given the nature of Texas independent school districts as statutory creations and given the rule of compulsory attendance, it seems doubtful that the authority to expel or suspend for a substantial time may be vested in any body other than the trustees of the district. *See also* Article 2780, Vernon's Annotated Texas Statutes.

cific ruling in evaluation of behavior. Shuttlesworth v. Birmingham, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965). It patently "sweeps within its broad scope activities that are constitutionally protected free speech and assembly." Cox v. Louisiana, 379 U.S. 536, 552, 85 S.Ct. 453, 463, 13 L.Ed.2d 471 (1965).

This is not meant in criticism of defendants. Generalities such as this one have been accepted for years as the proper sort of standard for our "unique educational environment." However, *Tinker* has tolled the beginnings of change. As Judge James Doyle wrote in Soglin v. Kauffman, 295 F.Supp. 978, 988 (W.D.Wisc.1968):

> I take notice that in the present day, expulsion from an institution of higher learning, or suspension for a period of time substantial enough to prevent one from obtaining academic credit for a particular term, may well be, and often is in fact, a more severe sanction than a monetary fine or a relatively brief confinement imposed by a court in a criminal proceeding. The world is much with the modern state university. Some find this regrettable, mourning the passing of what is said to have been the old order. I do not share this view.

The high school too is changing and generalities can no longer serve as standards of behavior when the right to obtain an education hangs in the balance. This regulation is unconstitutional for both "vagueness" and "overbreadth" and plaintiffs are entitled to a declaratory judgment to that effect. *See generally* the article by Professor Charles Alan Wright entitled The Constitution On the Campus, 22 Vand.L.Rev. 1027 (1969).

 Having concluded that defendants' regulation is overbroad, it falls upon the court to determine what equitable relief is proper protection for plaintiffs and their class. The determination of overbreadth coupled with the threat of further improper enforcement in the future clearly tends to "chill" the exercise of first amendment freedoms by students in Houston schools. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Such further improper enforcement will result in immediate and irreparable injury to plaintiffs' class, and they will be without an adequate remedy at law. The class is entitled to permanent injunctive relief preventing the use of the void regulation by defendants in the future.

 In this court's judgment, further equitable relief is required by the facts of this case so as to provide adequate protection for plaintiffs' class. A permanent injunction will issue prohibiting the defendants from imposing serious disciplinary sanctions, in the absence of precise and narrowly drawn regulations, upon students who write, print, distribute or otherwise engage in the publication of newspapers either on or off of school premises during either school hours or non-school hours unless such activities materially and substantially disrupt the normal operations of the school. 42 U.S.C.A. § 1983; 28 U.S.C.A. § 1343(3).

 Defendants will also be permanently enjoined from expelling or suspending for a substantial period of time secondary school students in the Houston school district who are guilty of any misconduct without compliance with minimal standards of procedural due process: (1) formal written notice of the charges and of the evidence against him must be provided to the student and his parents or guardian, (2) formal hearing affording both sides ample opportunity to present their cases by way of witnesses or other evidence, and (3) imposition of sanctions only on the basis of substantial evidence.

In 1943, Mr. Justice Jackson provided the principles which sustain this Court's decision today:

> The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of education not

excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943).

Counsel for plaintiffs will submit a proposed judgment and injunction immediately. It will be submitted to counsel for defendants for approval as to form.

### APPENDIX A

The Christmas holidays have just passed us by and, for most people, the expression can be taken literally. As in one of the current tunes, it was the time of the season for loving. During Christmas most people put on their masks of peace and good will toward men, and after struggling find they can almost be tolerant of one another. The problem is that too many restrict their efforts to a minimum. They find that they can appease their puny minds by talking about equality, justice, tolerance, and love of fellow men. If they would make a sincere effort to practice the ideology of the democracy that they supposedly hold so dear they might find that refreshing and productive relationships are possible.

People are able to meet on common ground and establish a productive rapport providing that all parties make a sincere effort. They can overcome their differences and search for solutions to common problems and means to reach common ends.

It is well known that the relationships between school administrators, faculty members, and students have been more than slightly hostile in the past, and that in the wake of incidents such as the intolerable locker checks one would discover that the basic underlying problem was one of misunderstanding and lack of communications. The communications could be more closely described as ultimatums, threatening the use of destructive forces at the disposal of both parties. It is evident that this type of situation renders more harm than good. A reversal of these ills can be accomplished only through sincere co-operation of all factions.

The first phase of this rehabilitation is renewal of faith in the intentions of the opposing parties. This factor was obviously lacking in the past. As we enter the closing months of this school year, it is still possible to establish a worthwhile relationship between the power of the schools and students.

We cannot neglect the fact that both the schools and the students, if antagonized, are capable of using force sufficient to disrupt the well being of each other. It is also obvious that a confrontation of this nature would result in regression rather than progression.

The common goal of both students and school administrators is development of the students minds in order that the well being of our constantly changing society will be enhanced by the intelligence that may be gained from a formal education. The role of the school is to present necessary technical and historical information; and the students responsibility is to assimilate this information, along with his own moral code, into a working philosophy of existence. A dispute arises in regard to what constitutes necessary and valid ideas.

As in the past, those in authority resent being told that their ideas are outmoded and those governed equally resent attempts to stifle their individuality and mold them into puppets of old guard authoritarians. This resentment prohibits objective discourse on the validity of old ideas and the necessity of new concepts. But this type of evaluation is a prerequisite for reform. In order for this to be accomplished the issues and their proposed solutions must be articulated and rational arguments presented

and examined in an objective manner. This cannot be done if either party decides to be the infallible authority.

WE ARE PRESENTING A SERIES OF ARTICLES IN AN ATTEMPT TO MAKE CLEAR OUR PROTESTS AND TO OFFER THE FACULTY AND ADMINISTRATION AN OPPORTUNITY TO INTELLIGENTLY DISCUSS THE ISSUES WHICH DIVIDE US AND DIVERT US FROM THE COMMON GOAL OF PROGRESS

—the editors

### "PFLASHLYTE

The *Pflashlyte* is made possible only by donations. All labor, time, writing, distribution, and use of printing equipment is supplied to us free of charge. The only money spent on this paper is for the purchase of paper, ink, and staples. We rely only on contributions made by students. If you are solicited for funds please contribute anything you can afford. Your donations will be greatly appreciated.

### SCHOOL SPIRIT VS. CONSCIENCE

The *Pflashlyte* has found it imperative to speak out on an issue which is presently somewhat obscure. Far too few students are aware of the absurdity of the fund drive for the Senior Project. The student body is only told that the drive is short by $350 and that its goal is $500 for the planting of shrubbery in the planter box. Announcements are made (by order of the Administration) to the effect that all students are expected to "co-operate" in the raising of money for this noteworthy project. Yet how many know that Mr. Stewart refused to let a group of students, in association with the International Red Cross, collect money for starving children in Biafra. The students were told that there is a school policy banning solicitations from students except when approved by the downtown Administration; later it was acceptable to begin a drive to solicit $500 from students in, order to buy a bunch of bushes.

Mr. Cobb, of the downtown office of HISD, told *Pflashlyte* investigators that the decision of which fund drives are to be allowed at schools lies in the individual principal's interpretation of school rules. In view of this, it is reasonable to assume that noble Mr. Stewart feels that planting bushes is far more important than feeding starving children. *Pflashlyte* sincerely hopes that Mr. Stewart will get his bushes and that his conscience doesn't bother him too much.

Anyone wishing to donate money for the needy in Biafra should contact the Red Cross headquarters, 2006 Smith—227-1151.

### EDMUND'S THOUGHTS

*Pflashlyte* brings you an inspirational dissertation from a model administrator.

Ah wosh tew thank yew all for yore generosity en givin me this oppertunity tew express mahself. Furst of all, ah wosh to say that ah'm proud as punch to be here an ah'm shure yew all are proud as punch to be en mah school. For mah fine capacity to suppress ideas, ah have been awarded this school and all yore minds. If yew all should fall from the path we'll have them athletic boys put you raht back on the track real quick like. And there ain't no need to thank me, its mah sacred mission to save yew from them bastard hippies and sech like. Remember ah'm here for yor- benefit and ah will employ evry means available under the divine raht of kings. In closin, ah wont to inform yew of the next Senior Project. "Under mah direction, the senior class is formin one of them extortion rackets to collect $500 for a 17-foot facsimile of mah posterior to be erected at the front gate so that all students might kiss the baloney stone each day before classes."

sincerely yours—
Edmund P. Senile

"The school program should be sufficiently flexible to meet all the needs of the student, whether physical, mental, moral, or social; and the teaching staff should give adequate consideration to the mental health, the emotional stability, and the physical well-being of every individual student.

Every phase of the school program should be explored for opportunities to promote democratic behavior through developing individual initiative, co-operation, and self-discipline. True democracy is attained only when every member of a group participates actively in planning and carrying out those activities which concern the group as a whole.

Every student should be taught to understand and appreciate the rights, duties, and priviledges of citizenship in a democracy; he should be taught to realize fully his own obligations as a member of his home, his school, his community, his state, and his nation."

The above is the way many of us feel that the school should be run. The points about democracy, and the schools striving for the welfare of the individual students are things I am sure none of us can deny as desireable. These points do seem fantastic, however, in that to have a school system as the above implies necessitates having school system personnel who accept these ideas. What is more fantastic, though, is that these three paragraphs are excerpts from the "Philosophy of the Secondary Schools" by Dr. Woodrow Watts, *Deputy Superintendent Secondary Schools,* Houston Independent School District.

We can now clearly see the humor and hypocrisy in the way the philosophy of the schools reads and its in fact application. Let us review the first paragraph and pick the major fallacies and discuss the reasons why they are false.

One, the school program is inflexible, and practically none of the physical, mental, moral, or social needs of the students (save for a small gr–up) are provided for. Many teachers, especially those in the Athletic Department, could give a damn about the mental health, emotional stability, or physical well-being of any student.

The second paragraph states that democratic behavior should be encouraged. This is probably the biggest farce which exists in the school system. How can a school be democratic when locker searches are made, people are suspended for bearing flags, people are suspended for carrying literature that the administration doesn't agree with, suspending people for exercising free speech rights, and suspending students for repulsing teacher aggression? And if a student speaks out on these issues he is punished for questioning authority.

The third paragraph says that every student should be taught citizenship, its rights, privileges, and duties. Since we have just noted that we are certainly not being shown citizenship's duties either. We learn from example, and this is the example that is shown to us. The school tells us to be good American children and do what we are told, not because we have to, but because we want to. On page 2 of the *Handbook for Secondary School Principals and Teachers,* though, it states that, under "Jury Duty," teachers are not required to serve on a jury, and so if they elect to do so they will be penalized by having the days they miss deducted from their salary. Jury duty is a duty of all Americans, who should want to do it, but teachers can not serve even if they want to, because they cannot afford the deduction from their salary.

The school system has, for the preceding reasons, shown themselves to be weak because they have violated their own code of conduct and when an organization violates its own rules, there is an indication of corruption and incompetence.

Students for a Democratic Society
"P F L A S H L Y T E"
THIS PAPER PROTECTS THE RIGHT OF STUDENTS TO KNOW WHAT IS GOING ON AND TO EXPRESS THEIR OPINIONS ON IMPORTANT ISSUES.
—the editors

### JUSTICE vs. SCHOOL POWER

If their is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or matters of opin-

ion or force citizens to confess by word or act their faith therein.

—Justice Robert H. Jackson

Are high-school students citizens? The fourteenth amendment to the Constitution of the United States answers this question; "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and to the state wherein they reside." [notice the word "all"] The 14th Amendment further states "no state shall make or enforce any law which shall abridge the priviledges or immunities of citizens * * * nor deny to any person within its jurisdiction the equal protection of the laws." An even more emphatic answer to the question is found in the recent supreme court ruling in favor of three Des Moines, Iowa high-school students who were expelled for peacefully protesting the Viet–Nam War. By its decision, the Supreme Court underscored the fact that high-school students are citizens under jurisdiction of the law and therefore entitled to equal protection under the law.

It is the duty fo all governmental agencies, *including school boards,* to operate within the limits of the Constitution and protect the people's rights. Unfortunately there are a few die-hard school administrators who, over in the light of Constitutional amendments and precedent setting Supreme Court decisions, continue to openly and ruthlessly violate the basic civil rights guaranteed to all citizens. Students are suspended or expelled for exercising their legal rights of freedom of speech, press, and assembly. In an effort to justify their actions, administrators claim that forms of expression such as newspapers printed without their approval and the display of American flags are in violation of civil law. Those who use this reasoning only make themselves look ridiculous because they are using laws as a basis for suppressing laws. For some reason, administrators never answer student proposals in a calm and intelligent manner; nor do they attempt to rationalize their stand on any particular issue. They merely hand down ultimatums. [Could it be that they are afraid to meet students as equals?] The days of "blind obedience" are over; intelligent people want reasons before they act.

In the long run, we must be prepared to work for the reforms we want. We cannot sit back and relax just because of a few Amendments and court rulings. Establishments are reluctant to change and are apt to ignore the escence of the justice that they themselves teach. To protect our rights we must understand them fully and we must be willing to work to preserve them. If we give up and knuckle under to injustices dealt us by a "dime store dictator" what will happen later in life when we have to face abominations considerably more unbearable than the ones we face here in school? Get on your knees and bow to autocratic administrators or hold out for something that fits a little better in a supposedly democratic society! ITS

OUR CHOICE!!!

### *YOUR RIGHTS*

This paper will present a series of articles discussing the rights insured by the Bill of Rights and how they specifically apply to students

—the editors

If you read the final edition of the *Chronicle* of Monday, February 24, 1969, you would have undoubtedly read the article on the Supreme Court's ruling on student protests. "The Supreme Court, insured today, the right of school children to hold protest demonstrations but emphasised officials may impose restraints in there are intrusions upon the work of the school or the rights of other students. The *Chronicle* quoted Justice Abe Fortas as saying "It can hardly be argued that either students or teachers shed their Constitutional rights to freedom of speech or expression at the schoolhouse gate." Further, "they (students) are possessed of fundamental rights which the state must respect * * *." This position was affirmed by the clear majority of support from

the other justices. The decision was verified by 7–2 vote.

The primary principles in question involved the dispute over to what degree freedom of speech and expression should be extended. We do not see how anyone can decy students the right to express themselves as they desire when not endangering the lives or rights of others. The principle of equal treatment was one of the most fundamental rights guaranteed by the Bill of Rights.

A good discussion of freedom of expression may be found in *A Living Bill of Rights,* written by Justice William O. Douglas, published by Doubleday & Co., Inc. In his book, Douglas states, "man has responded to this power of expression in one of two ways. Some have said that since ideas may be dangerous, their expression must be carefully controlled by those in power. This has been the approach of * * * all totalitarians." The other approach is that taken by the United States Constitution; "Congress shall make no law * * * abridging the freedom of speech or of the press." Which approach has the Administration of Sharpstown taken? If you are cunning enough to glimpse at a *Handbook for Principals and Teachers—Secondary Schools,* be sure to read the paragraph entitled "Principals." You will find that school principals "* * * may enforce obedience to all rules and regulations which are lawful and reasonable." In other words, principals, or schools, may enact rules only if they are lawful *and* reasonable, not lawful *or* reasonable, but lawful *and* reasonable. The Supreme Court and even the Constitution of the United States have asserted that it is unsawful to restrict human beings the right of expression. Therefore, schools may not enact a rule contrary to this principal. Yet schools have tried to place themselves in a higher position them the Supreme Court by in effect overruling the rights insured by the Constitution. Is the school so sovereign? We don't think so and neither does the Supreme Court.

## EDMUND'S THOUGHTS

Some students are confused by the regulations here. To make these rules clearer, I will explain—

1/ No boy shall be allowed to wear his hair longer than two inches. There have been numerous reports of students stranggling themselves while sharpening their pencils. But there are more important reasons. It is feared that another outbreak of Bubonic Plague is on its way very soon. Any day now, they may to start cleaning the floors of the school. Still another reason exists. The members of the coaching department obviously have a definite sight problem. The don't seem to be able to distinguish male and female students unless the males have hair cut in the style of a Tibetian monk. Several accounts of forcible rape have been filed by boys in all gym classes.

2/ No one shall wear a neckercheif or scarf about their neck. It has been reported that one of the faculty members is actually a missing link between man and the Orangutan. Necties are permissable since Orangutangs do not know there are such things and therefore will not strangle you.

3/ There is strong evidence that there are some students at this school who actually beleive in Democracy. NASTY, NASTY!!! All of this garbage about rights and dignity of man went out the same tiem justice, peace, love and sanity did (when you registered at Sharpstown). So get all of that out of your system. We want the school to be just as sterile and smooth-running as we can make it. Just act like a vegetable waiting to be eaten, close your eyes and you won't feel a thing.

4/ Due to an excessive number of students losing their eyeballs, no one will be permitted to give the peace sign. Medical authorities agree that the best way to cope with the problem is to break the students fingers so they will swell up and not fit into the eye sockets. Science wins again!!!!!!!

5/ Students are not allowed to remain across the street from school before

classes. Geologists report that there is a very large crack in the earth in the park. Years ago it was sealed with 17 tons of bubble gum, but since we are now closer to the sun than we were at that time, there is a great danger that it will all melt and result in students falling to China.

6/ All fire alarms have been disconnected so that no one will miss all the excitement. If anyone discovers someone reporting a fire, take him to the office where he will be promptly be stoned to death with wet erasers.

7/ No one shall bear the American flag in the presence of the Administration. Although very quaint, it is also very dangerous as there are people in the school who do not believe in Life, Liberty and the Pursuit of Happiness.

8/ Beware fo what type literature you posess. Excerpts from the PTA bulletins and the *Handbook for Principals and Teachers—Secondary Schools* are thought to be coded messages to communist agents seeking the overthrow of the schools. It is a well known fact the the Bible preaches communal living and in fact perpetrates a fanatic cult of weirdos called Christians. Beware of these people. They are occassionally seen nailed to the office walls.

9/ Do not, under any curcumstances, collect money for the starving children of Biafra. Some of the money goes to Nigeria and as soon as the babies are born there, they are inducted into the Communist Party.

10/ Last of all, do not think. This practice has recently been found to cause irreparable damage to brainwashed minds. This type of activity causes the brain to overheat and warp your values until instilling such beliefs as dressing as one wants and thinking and saying as one feels. You may even degenerate to the point of belief in love. remember the Sharpstown slogan:

ALL FOR NOTHING AND NOTHING FOR ALL!!!!!!!!!!!!!!

yours sincerely,
Edmund P. Senile

[this was translated by Mr. Senile's secretary due to the disaster of his last article]

### ATTEMPT TO COMMUNICATE

Many students have legitimate gripes about their school (and it is *their* school, supported by *their* parents' tax money) which they would like to express openly to the Administration. Some are able to do so indirectly through a faculty member who really cares about the student, but more often than not he is unable to do so and will not go to the Administration because of a deep fear of the *office*. We would like to encourage students to go to the office and find someone to talk to there and express their gripes, because, believe it or not, there are some people in the office who want to help. Unfortunately, this attempt often fails because of several reasons. One, the student fails to make an appointment and finds the administrator at a very busy part of his day and is subsequently brushes off and leaves scared, dissapointed, and angry. Two, the student fails to clearly state his idea to the administrator; or, the administrator jumps to the conclusion. Third, the student seems beligerent and the administrator gets angry and yells at the student without listening to what is to be said. Worse, however, is the mutual misunderstanding between the student and administrator. All to often, something of importance to the student seems quite unimportant to the administrator to ignores the student. This attitude eventually results in a great wall of hostility between the student body and the office.

There are many faults with our school system which will be presented, but this is one which can be corrected easily, and *should* be corrected. But to correct it will take work and giving from both sides. Several times this year the Administration has offered us talk sessions and then retracted the offer. It is this paper's opinion that much unrest in the school could be eased if this plan were brought into effect, and certain rules

under the jurisdiction of the principal (and we know what these are) were changed somewhat according to popular student vote and ideas. We hope that the Administration will consider all that has been said in an open light and do something about it because, then, we of this paper will have done something to help our school.

## ARGUMENT FOR PREE SPEECH AND PRESS

As anticipated, the second issue of *Pfsashlyte* brought about unconstitutional and suppressive reprisals from the Administration. The School has obviously taken upon itself the sovereignty to overrule the Constitution of the United States, thereby castrating the ideals of democracy and suppressing the production of creative ideas.

They should pull the wax out of their ears and listen to the works of our forefathers; "Congress shall make no law * * * abridging the freedom of speech or of the press; or the right of the people peacefully to assemble and to petition the government for a redress of greviences" [Amendment I].
and

"the Fourteenth Amendment, as now applied to the states, protects the citizens against the state itself ad- all of its creatures"—boards of education not excluded. These have, of course, delicate and highly discretionary functions, but none that they cannot perforem within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedom of the individual if we are not to strangle the free mind at its source and teach youths to discount important principles of government as mere platitudes.

Such boards are numerous and their territorial jurisdiction often small. But small and local authority may feel less sense of responsibility to the Constitution and agencies of publicity may be less vigilant in calling it to account. "* * * there are village tyrants as well as village Hampdens, but none who acts under the color of law is beyond reach of the Constitution."

Mr. Justice Jackson, in delivering the opinion of the Court, in West Virginia State Board of Education v. Barnette/ 319 U.S. 624 (1943)

printed for Pflashlyte by SDS

## APPENDIX B

In the United States District Court
for the Southern District of Texas
Houston Division

Dan Sullivan, by next friend Daniel H. Sullivan, Michael Fischer, by next friend George David Fischer, et al

vs.

Houston Independent School District, The Board of Trustees of the Houston Independent School District, The Superintendent of the Houston Independent School District and Mr. Coy P. Stewart, Principal of Sharpstown High School

C.A. No. 69–H–266

ORAL AND INFORMAL FINDINGS
OF FACT AND CONCLUSIONS
OF LAW

APRIL 15, 1969
4:15 P.M.

THE COURT: In 69–H–266 in addition to the admissions and stipulations and agreements of parties, the Court will make these oral and informal Findings of Fact and Conclusions of Law which, of course, are based on a careful evaluation of all of the evidence in the case.

Generally, the Court finds for the minor Plaintiffs and will issue at least two temporary injunctions.

The Plaintiffs will prepare and submit to the Court within ten days a formal proposed injunction, not inconsistent with the orders of the Court today and in a separate document, formal proposed Findings of Fact and Conclusions of Law. They shall be submitted to the Court within ten days and to counsel for the Defendants.

Counsel for Defendants has ten days in which to respond to the Findings of Fact and Conclusions of Law.

Of course, there is no doubt that the Plaintiffs did write and distribute the PFLASHLYTE off campus and not during school hours.

There is no doubt that the Principal Stewart said that he suspended the Plaintiffs because the papers disturbed the normal activities throughout the school day. Of course, the Court especially finds that. I think you may have admitted that when you read your stipulations.

I also find that the Plaintiffs are not members of the S.D.S. and whether or not that's relevant is immaterial, really.

I also find, especially that the Principal Stewart had not promulgated rules to alert students to what they could do and could not do in a definite, concise way and precise way, which I think the Principal can do and that would regulate this growing problem of what we have called "underground" papers.

The Court has jurisdiction of this cause under 28 United States Code Annotated, Section 1343(3) and 42 United States Code Annotated 1983.

Although the Court will not give its final ruling on the class action, the Court has really almost made up its mind that this is a properly maintainable suit as a class action under Rule 23(a) and (b) (2). It does appear to the Court that the class is too large to make it practical to join all of them in this action.

And that at least under Rule 23(a) all of the prerequisites to a class action have been met. I have about made up my mind that this is a class action which is maintainable under Rule 23(b) (2), but that will be in the final opinion of this Court.

As far as the Plea in Abatement is concerned for the exhaustion of administrative remedies, I don't think that's applicable to an action under Title 42, Section 1983. In fact, it appears to me that as a factual basis that these Plaintiffs did about all they could do under the rules as they knew them in exhausting their remedies.

I especially appreciate the action of Mr. Myrl Johnson, the assistant to Mr. Watts, operating as best he could with a great concern for these individuals. I appreciate that very much.

It seems to me, though, that really they should not have to go from principal to principal with their hats in their hands, so to speak, in trying to get in a school. That there should be a more definite way that when a child is disciplined, that he should not have to take the initiative himself in such a way that he is really handicapped and harmed by a delay, especially seniors—although these last remarks are not necessary to this case.

I find that the activities of the students did not materially and substantially interfere with the requirements of appropriate discipline in the operation of the school nor materially disrupt class work or involve substantially disorder or invasion of the rights of others.

I base this on the testimony I have heard of all of the witnesses, especially the witnesses for the Defendants.

I find that at most the Defendants' witnesses, including Mr. Stewart, really indicated to me, as a finder of facts, that this distribution of the papers caused only a minor inconvenience and nuisance and curiosity out at that school. Although, I realize they subjectively said they disrupted the school, I don't find that. I think that they did not.

That most of the witnesses for the Defendants, as I interpret their testimony, shows about only half a dozen specific instances of teachers having to pick up papers or having to move children who were congregating in the hall or having to refuse to discuss the papers with students. I don't think there was any turmoil, nor was there anything out there that would incite disobedience to the authorities of the school.

I see nothing wrong, of course, with the children taking pros and cons issues, such as the planter that was put out there.

Now, this is all based on the facts as I find them. Mr. Stewart testified that there was no physical violence at all. So far as he knew, no child ever refused to turn over a paper to a teacher. In fact, the evidence shows that every time they asked for a paper, they gave it up without any protest or even disturbance in the class.

There is no evidence, really, in the case except that one discipline card which could be interpreted as any disciplinary action being taken. It seems to me that out here at this school that the school administration really keeps a tight rein on these children which they should properly do. I feel, because the other discipline cards reflected conduct of minimal nature, which really didn't require anything drastic—especially such as kicking children out of school—that that in itself shows that it really didn't upset or disturb the operations of this school. If they had, I am sure there would have been a good many discipline cards out there in view of the fact that these teachers do make discipline cards on minor, what I would call minor infractions, such as tapping your feet on the floor or not having your hair cut.

Also, when you go back and look at the testimony of the Defendants, the Assistant Principal, Mr. Jackson, the most I can get out of his testimony is he saw some students gathered together and they had something on their minds that concerned them. He felt there was some unrest generated in the school.

Coach Don Ellinor saw some papers in a neat pile in the restroom. At one time he picked a paper up from a girl in the classroom, but she offered no resistance and made no disturbance or protest. He just picked it up.

The little lady, Jeannine Wallace, said she picked up two papers. She said she noticed some milling around in the halls and talking, but she didn't know what they were talking about, but there was some milling around in the halls. As crowded as those halls are between classes, it really didn't amount to any activity that would disrupt the school or cause a discipline problem.

Mrs. Kendall, the retired IRS lady: her testimony really boiled down to the fact that she was waiting in the classroom between classes one day and waiting for another teacher. She saw one of the children reading something she had never seen before. She had no idea what it was. But she went back there and asked him for it. Before he could respond, in her words, she had it. Then she thought there was another child who had something; and I am not criticizing this lady at all, but the fact is that she tried to find something else and it was a paperback book and maybe a health card. She was insistent, and I am not saying she shouldn't be insistent, but they found nothing else on that child. She did notice a change of attitude. I have heard this from several witnesses. I don't really put much stock into that in the context of this case.

The little lady, Cyril Hosley: she said that she did notice children were more

tardy, had more in the study hall, but she didn't know why. That she expressly said nobody disrupted the class by reading this material.

The math teacher, the retired officer, said the children wanted to talk to him about this paper and he wouldn't allow it. I got the impression, from questioning him, that those children in that class wanted to talk about anything except mathematics and he was able to handle them very well. It certainly wasn't the type of conduct that would cause or be used as a basis of expelling students.

Mr. Sydney Johnson said that after these two students were expelled, that he sent the two boys to Mr. Jackson because they had papers in class, but they told him it was found on the floor. I questioned this witness. He said that that's what they always say when they have something like that. This indicates to me that students are now like they used to be when I went to school, that they do have things in class that they shouldn't have.

But all of these papers, the most it seems to me was that there was a good number of papers in school, but the discipline out at that school is so well developed that all they had to do is say give me the paper and it certainly did not disrupt the school.

I really have a feeling that it was what was in those papers that really caused the trouble more than anything else. I can understand that very well.

I find that these activities of these two Plaintiffs have not interfered with the rights of other students at Sharpstown High School.

I don't think there is any evidence, really, that convinces me, and I find it did not convince me, that there were facts which might reasonably lead school authorities to forecast substantive disruption of or material interference with school activities.

The Junior Chamber of Commerce distributed their papers which you see in the papers everywhere. I don't think that would have caused any principal to have thought that he had to stamp out

some evil or something that's going to cause the downfall of the school.

Lieutenant Singleton of the Police Department, Intelligence Division, said he kept the schools informed of S.D.S. But Mr. Jackson on the stand said he never heard of any communications, and he was the associate principal, from the administration downtown concerning the activities of S.D.S. I have an idea that he knew about as much as anybody about S.D.S. We can't all help but know something about it from reading the papers.

From what I have said it's obvious, of course, that the Defendants are hereby enjoined from refusing to permit the minor Plaintiffs to attend classes and to exercise all of the usual rights and privileges of students of Sharpstown High School for any causes that arose before today, April 15, 1969.

The Defendants are also enjoined from refusing to afford the minor Plaintiffs a reasonable opportunity to complete and submit for academic credit such work that has been missed by the minor Plaintiffs during the period of their suspension and during the time they have been in court.

The Court does not think it's necessary to enjoin, and the Court does not enjoin, because the Court does not think it's necessary to even be concerned with whether or not the school is going to harass or intimidate these people in the future, that is, these minor Plaintiffs, either directly or through derogatory, threatening speech or conduct directed to them because they have taken the action they have. Now, finally, because we are not announcing an injunction, temporary, on the class action, although I think it is appropriate, I am not going to do it just out of an abundance of caution.

Finally, the Court will enjoin the school from expelling or disciplining Dan Sullivan and Michael Fischer solely on account of the publication of written or printed materials away from school premises or on account of the distribution thereof outside of classes and build-

ings of the school. Provided, however, that nothing herein shall prohibit the said Defendants from the issuance and enforcement of appropriate rules and regulations governing the use or presence of publications or other materials in classrooms or in school buildings in order to avoid material and substantial interference with appropriate discipline in the operations of the school.

Finally, the Court will say this: That the Court is very well aware of the problems in the school systems, of discipline. I am also aware of the fact that young men, one or two years older than these two young boys, for the last 175 years about every 25 years are called upon to give their lives to protect the First Amendment rights. I know all of you realize that.

When we start weighing in the balance what's really important and what's less important, that's what concerns the Court, that the Court knows that in this age of permissiveness, that students are trying to enter into a dialogue, as one of these young teachers said, with authority. That they probably feel, like a lot of people feel today, that because of innovations in technology, especially communications, children learn a lot today. They asked them why. It's the smartest, the best educated and most inquiring generation I think the world has ever seen because they not only learn what's in the schoolroom but they learn what's on television and in the newspapers. They are asking questions and they want to have a dialogue and they don't have it, they have confrontations which are not always peaceful.

I feel that the school system here, especially Sharpstown, has the backing of most of the students and the parents out there. They can enforce discipline so that they can also regulate the distribution of student papers in such a way that they certainly can have regulations that will govern the manner and the means of how they are distributed. Nobody wants to have ugly things said about them.

So, that's the ruling of the Court.